UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIAN BARTRAM,                          :   NO.: 3:02CV2148(SRU)
      Plaintiff,

vs.

TOWN OF WEST HARTFORD, CARL
ROSENSWEIG, J.A. GAREWSKI,
JOSEPH LASATA and STEPHEN B.
ESTES,                                  :   JUNE 3, 2004
      Defendants.

**MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT:**

Plaintiff Brian Bartram has brought this action against

Assistant Chief Carl Rosensweig, Captain Jeffrey Garewski, Lt.

Joseph LaSata, Sergeant Stephen Estes and Chief James Strillacci,

all members of the West Hartford Police Department.[1]

In the First Count of Plaintiff's Second Amended Complaint,

the plaintiff claims, pursuant to 42 U.S.C. § 1983 that defendants

Strillacci, Garewski, Lasata and Estes violated his First, Fourth

and Fourteenth Amendment rights, by causing him to be transported

to a hospital for an emergency psychiatric evaluation in accordance

with Connecticut General Statutes § 17a-503, and by obtaining a

search warrant for his home.  As to defendant Rosensweig, plaintiff

claims only that Rosensweig, without reasonable cause, ordered him

_____

[1] Strillacci was added as a defendant by way of a motion to amend complaint,
which was granted by the court on April 25, 2004.

to submit to a "fitness for duty" examination by a psychotherapist in alleged contravention of a collective bargaining agreement. However, plaintiff but has failed to allege how this action violated his constitutional rights, or even which constitutional rights were violated.

Although the Second Amended Complaint continues to allege that the defendants have been sued in their individual and official capacities, the official capacity claims were dismissed by the court on August 28, 2003, together with all of plaintiff's claims against the Town of West Hartford.  Likewise, although the Second Amended Complaint continues to allege an "equal protection" violation in Paragraph 45 of the First Count, that claim was dismissed by the court on August 28, 2003, for failure to state a claim.

The Second, Third and Fourth Counts allege state law claims of intentional infliction of emotional distress, defamation and false imprisonment, respectively, against all defendants.

**STANDARDS FOR SUMMARY JUDGMENT**

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c).  Rule 56(c) provides that "the mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247-48 (1986) (emphasis added). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims...(and) it should be interpreted in a way that allows it to accomplish this purpose." <u>Celotex v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 12 (2d Cir. 1986), <u>cert. denied</u> 480 U.S. 932 (1987). Additionally, "mere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." <u>Quinn v. Syracuse Model Neighborhood Corp.</u>, 613 F.2d 438, 445 (2d Cir. 1980) (quoting <u>LEC v. Research Automation Corp.</u>, 585 F.2d 31, 33 (2d Cir. 1978)).

Once the moving party has met its burden, "the non-moving party, in order to defeat summary judgment, must come forward with

-3-

evidence that would be sufficient to support a jury verdict in his favor." Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995).

Qualified immunity is appropriately raised by a motion for summary judgment. Butz v. Ecomonou, 483 U.S. 478, 507-508, 98 S.Ct. 2894, 57 L.Ed. 895 (1978). When qualified immunity is raised by a motion for summary judgment, "plaintiffs may not unwrap a public officer's cloak of immunity from suit simply by alleging even meritorious factual disputes...when those controversies are nevertheless not material to the ultimate resolution of the immunity issue." Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir. 1992).

Summary judgment has been encouraged as a valuable means for avoiding unnecessary trials, and modern Supreme Court and Second Circuit cases have encouraged its use for the purpose. See, e.g., Celotex, supra; H.L. Hayden Co. of N.Y. v. Siemens Medical Systems, 879 F.2d 1005, 1011 (2d Cir. 1989); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) cert. denied 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

## DISCUSSION OF FACTS

As set forth in defendants' Local Rule 56(a) statement, the evidentiary record in this case reveals the following undisputed

facts, which appear to be all of those which are material for purposes of this motion.

At all relevant times, plaintiff Brian Bartram was employed as a Public Safety Dispatcher with the Town of West Hartford Police Department.  During the fall of 1998, plaintiff Bartram was diagnosed with Hepatitis C.  On December 27, 2001, he began a forty-eight week course of Interferon treatment for the Hepatitis C.  Prior to beginning the treatment, his doctor warned him of a number of potential side effects from that course of medication, including sleep disturbances, anemia, and in rare cases, suicidal or homicidal tendencies.  His doctor further recommended that he take an antidepressant, Paxil, during the treatment.

Before even beginning the treatments, Bartram made an agreement with his wife Heather that if any ill effects from the medication gave him or his wife any cause for concern about having seventeen firearms in their home, the firearms would be transferred to his brother-in-law for safe keeping.  Plaintiff Bartram did experience various side effects from the Hepatitis C treatments, including loss of sleep, loss of appetite, anemia, extreme shortness of breath, extreme fatigue and irritability.  The plaintiff was concerned enough about the side effects to send his two children to live with their grandparents in Florida for the months of February, March and April, 2002.

Plaintiff Bartram did not tell anyone in the West Hartford police administration, or any of his supervisors, about the fact that he was diagnosed with Hepatitis C or that he was undergoing a course of medication which caused numerous side effects.  The only co-workers he informed about the Hepatitis C and his course of medication were Todd Hungerford and Sue MacDonald, his two closest friends at the police department.  He informed them in late December, 2001, and asked them to keep the information confidential.  Bartram discussed his concerns about the side effects of the medication with Hungerford and MacDonald, so that they could notify him if they noticed any problems or decline in his work.

Toward the end of March 2002, plaintiff Bartram learned that these two close friends, Todd Hungerford and Sue MacDonald, were having an affair.  Bartram felt wounded by the affair and reacted badly to it.  He stopped speaking to them and vice versa.  Despite his concerns, plaintiff Bartram never complained to any of his supervisors or to any of the defendants regarding the affair or its effect on communications in the workplace, before April 17, 2002.

In the early morning hours of April 17, 2002, the plaintiff's wife, Heather, who was also employed by the West Hartford Police Department as a Public Safety Dispatcher, went to defendant Captain Garewski's office and asked to talk.  She was very emotional.  She

told Captain Garewski that plaintiff was upset about a personal
relationship that had developed between two co-workers, Sue
MacDonald and Todd Hungerford, and the alleged affair's effect on
relationships within the ERC.  She said that the plaintiff was not
doing very well with the situation and in addition had a personal
health situation that he was dealing with.  She also said that the
plaintiff was not eating and was having trouble sleeping.  Captain
Garewski told Heather that he would speak with the involved parties
and suggested that Brian seek some assistance from Pathways, a
counseling service available to employees, to deal with his
personal issues.  Heather said that she would mention it to the
plaintiff when she got home.

     Later that morning, Captain Garewski went to the ERC to talk
to personnel there.  Dispatchers Iris Goldfarb and Sharon Williams
were present.  Iris immediately raised some personal issues
relating to a conflict with another dispatcher, Carol, and
complained that Carol was spreading lies about what was going on in
ERC.  Iris also said that the Sue MacDonald/Todd Hungerford
situation was making her uncomfortable.  Iris then stated that she
felt that Brian Bartram was becoming ill because of Carol's lies
and the Sue and Todd relationship.  Captain Garewski told Iris that
the first he heard of this was earlier that morning when Heather
referred to it, asked Iris why it took several months to report the

situation to a supervisor, and told her that any concerns should have been reported as soon as they occurred so that they could have been handled immediately.  He also told her that he would address the issue with both Sue and Todd Hungerford.

Iris said that she needed a breath of fresh air and then she walked outside to the ERC courtyard.  About an hour later, Captain Garewski heard a radio call that an ambulance was needed in the rear courtyard.  He responded to where Iris was being treated by medical personnel and learned that she had apparently passed out.

On that same afternoon at approximately 1:00 p.m. plaintiff Bartram called the ERC and was told by dispatcher Sonja Vigue that their co-worker, Iris Goldfarb, had evidently passed out and had been taken to the hospital.

Thereafter, at approximately 2:30-2:45 p.m., plaintiff Bartram came into the ERC highly agitated, red-faced and yelling.  He was sputtering things like, "They better talk to me.  They talked to everybody else.  Nobody's talked to me.  They didn't talk to Todd Smith and look what happened."  Dispatcher Sonja Vigue, who was working in the ERC, heard the remarks and, after thinking about it for a bit, felt that the statement about Todd Smith was a "red flag" and a "cry for help", as Todd Smith was a West Hartford police officer who had shot and killed himself in his police cruiser about a year before.

At approximately 3:30 p.m. dispatcher Sue MacDonald came to Captain Garewski's office at his request.  Captain Garewski told her that he wanted to discuss some issues that had been brought to his attention, and asked her about her current relationship with Brian Bartram.  Sue said that she and Brian used to be good friends, but that since he became aware of her relationship with Todd Hungerford, he had become increasingly difficult to work with and had refused to talk to her.  When she tried to reach out to him about this, his response was a profanity.

While Captain Garewski was talking to Sue MacDonald, he received a telephone call from Dispatcher Sonja Vigue, who had just gotten off work.  Sonja expressed to Garewski her serious concerns about the plaintiff, whom she had interacted with a short while before, and asked if Captain Garewski was planning to talk with plaintiff.  Sonja told Captain Garewski that "He really wants to talk to you.  He is talking about Todd Smith and I don't know what he is going to do."  Captain Garewski told Sonja that plaintiff had made similar remarks in the presence of others that day, including himself, and he assured Sonja that he would talk to the plaintiff.

Shortly thereafter, Captain Garewski asked the plaintiff to come to his office.  He did so at approximately 4:00 p.m. and he immediately asked Captain Garewski if he needed a "union rep".  Captain Garewski told plaintiff that he was merely aware that the

plaintiff wanted to talk and that the meeting was in no way disciplinary.  Captain Garewski told plaintiff that he was looking into several alleged problems in the ERC and that he wanted to know how the plaintiff felt about it.  Plaintiff Bartram was immediately argumentative and seemed infuriated with the relationship between Sue MacDonald and Todd Hungerford.  The plaintiff said that something had better be done about that relationship right away or he was going to have an attorney file suit against the administration for allowing a "sexually charged workplace".  The plaintiff said that he could not work with Sue and Todd Hungerford and that he had been taking vacation and comp time so that he would not have to work with them, and that working with them was making him sick.

   At this point the plaintiff was enraged.  His hands were shaking.  The plaintiff told Captain Garewski that he had some health issues, and that he had been losing weight and not sleeping since his co-workers' relationship started.  As Captain Garewski tried to calm the plaintiff down, he became louder and kept cutting him off.  The plaintiff acknowledged that he was aware of Captain Garewski's conversation with his wife earlier that morning, and of Captain Garewski's suggestion that the plaintiff speak with a counselor at Pathways.  He then told Captain Garewski, his supervisor, "It's nobody's fucking business who I talk to."

Plaintiff repeated that Sue and Todd Hungerford would not talk to him, and that they had created a hostile workplace that he could not work in. He specifically told Captain Garewski, "I want them to talk to me. It took everyone too long to talk to Todd Smith." The plaintiff continued to be very upset and to use profanity. He repeated that he would not work with Sue MacDonald and Todd Hungerford and had arranged his work schedule so that he would never have to talk to them again. Garewski told plaintiff that this may be an uncomfortable situation for him and others, but that the plaintiff seemed to be the most unyielding about the matter. Plaintiff Bartram became even more upset than before and said that he was being "persecuted". When Captain Garewski told him that the conversation was over and asked him to leave, Bartram slammed the crash bars on the door as he went down the stairs.

The agitation and demeanor displayed by the plaintiff during the meeting were especially disturbing to Captain Garewski because he felt that both were very out of character for the plaintiff, whom he had previously always found to be courteous, cooperative and respectful.

That same afternoon of April 17, 2002, defendant Sergeant Stephen Estes was on duty when plaintiff Bartram came into the first floor hallway from upstairs. Before Sergeant Estes could greet him, plaintiff Bartram conspicuously glared at him and

-11-

marched down the hallway in a forceful manner, and appeared to Estes to be in an emotional and agitated state.

Captain Garewski then called the plaintiff's immediate supervisor, Lt. Lasata, and told him about the meeting and of his concern about the plaintiff's physical and mental health. Defendant Captain Garewski also told Lt. Lasata that plaintiff had made some comments which Garewski believed to indicate that Bartram was possibly suicidal. Captain Garewski asked defendant Lt. Lasata what other supervisor was working, and was informed that Sergeant Estes was. Lt. Lasata told Captain Garewski that the plaintiff had gone out to his car and agreed to let Captain Garewski know when the plaintiff returned. Captain Garewski briefly filled Chief Strillacci in on what had happened.

Shortly thereafter, plaintiff was requested to join Garewski, Lasata and Estes in the Lieutenants' office. During the meeting, plaintiff Bartram's voice was raised, he was agitated and emotional. Plaintiff Bartram was asked if he felt alright and if he wanted to go home. Bartram said that he did not want to go home and that he felt fine, but mentioned again that he felt persecuted.

Captain Garewski asked plaintiff Bartram if he had any firearms with him or in his car and he replied that he did not. Captain Garewski asked if him if he was thinking of hurting himself

-12-

and he replied, "No, but it would be easy to do because I have firearms at home.  You remember what happened to Todd Smith."

Captain Garewski, Lt. Lasata and Sergeant Estes were each very concerned about plaintiff Bartram's reference to Todd Smith, and to having firearms at home.  All three were well aware that Todd Smith was a West Hartford police officer who had committed suicide with a firearm on duty approximately a year before.  Based on plaintiff Bartram's emotional state, his statement about Todd Smith, and his reference to having firearms at home, the three supervisors each believed he might be suicidal.

After conferring in private, the three determined that the safest thing they could do for plaintiff Bartram and everyone else was to send him to a hospital for an evaluation by a professional, as allowed under state law.  Lt. Lasata then went to the ERC and asked the only dispatcher working, Sue MacDonald, to call an ambulance, "code two", which means no lights or sirens, which she did by telephone.  As requested by Captain Garewski, the ambulance was instructed to meet them in the back of the police department to keep things as low key as possible.

Captain Garewski then briefed Chief Strillacci on the three defendant supervisors' concerns about Bartram and on the actions they had decided to take, and the Chief supported their decision.

Sergeant Estes informed plaintiff Bartram that they were arranging for him to be transported to a hospital for an evaluation.  After being told this, plaintiff became calm and cooperative.  Bartram asked if he could first change out of his uniform, so Sergeant Estes stood by while he did so.  Plaintiff Bartram also asked Estes who would pay for the evaluation, and whether it would cause the state police to take away his pistol permits.  At no time did he question the decision or resist the officers in implementing their decision

Sergeant Estes prepared a police emergency examination request pursuant to C.G.S. § 17a-503, on a Department of Mental Health and Addiction Services form, which he gave to the responding EMT's.

Bartram was not physically restrained in any way, and he walked cooperatively to the ambulance.  Plaintiff did refuse to answer the EMT's when they asked him for his pertinent medical information.  The ambulance then left for the John Dempsey Hospital at the University of Connecticut.

In view of Bartram's statement of having firearms at home, an application for a search and seizure warrant was then prepared in order to secure all of Bartram's firearms for his safety, and that of others.  Once the application was completed, Sergeant Estes called Assistant State's Attorney John O'Reilly.  Sergeant Estes read the body of the search and seizure warrant to O'Reilly,

explained what had taken place, and answered O'Reilly's various questions.  O'Reilly verbally approved the warrant, and said that it was alright to present it to a judge.

Sergeant Estes and Sergeant Tom Traskos then went to the home of Superior Court Judge Rubinow, who signed the warrant at approximately 9:15 p.m.  The warrant authorized them to search plaintiff Bartram's automobiles and his Suffield, Connecticut residence for firearms.  Suffield Police Department was then notified that they would be executing a search and seizure warrant in Suffield's jurisdiction.

At approximately 10:30 p.m., Sergeant Estes went to the Bartram residence in Suffield together with Sergeant Traskos, Detectives Semper and Nelson, and Sergeant Huntley of the Suffield Police Department.  Plaintiff's wife, Heather Bartram, answered the door and allowed the police officers to enter the premises. Heather told them that after a telephone conversation with plaintiff Bartram at the hospital, she had given the guns to a relative, Greg Gardner, approximately one half hour prior to their arrival.  (Although she did not tell the officers this, she had made this arrangement in accordance with the plan she and her husband had agreed to before he commenced the Hepatitis C medication regimen.)  The officers searched the residence and found ammunition and magazines, but no guns.

-15-

After they completed their search, Heather talked to them about plaintiff Bartram. She confirmed that Bartram was having both physical and mental health issues, and that she had had a long conversation with him regarding Todd Smith's suicide. Heather also told them that Brian was on an anti-depressant medicine. As the police officers were leaving, Heather told them that plaintiff Bartram had called her from the hospital just as they were there and said that the hospital would be releasing him.

Meanwhile, plaintiff Bartram had arrived at the John Dempsey Hospital at 6:22 p.m. The hospital consultation report states that "pt is a 33 year old male presents to ED on police emergency certificate for evaluation for suicidality. Patient has been having difficulties with his colleagues at work. He recently found out his two good friends are having an affair and has stopped talking to them. For the past three weeks he has been upset at the conflict at work for he continues to have to work with them in the same room. Today the sergeant tried to talk with him and asked him if he could reconcile and he got upset and started to say obscenities. He was questioned about suicidal ideation and patient stated that he was not, and he understood why they were asking, because of another cop that had committed suicide and when asked if he had guns stated 'at home'." The notes further indicate that the

plaintiff Bartram acknowledged having suicidal ideation in high school due to depression.

During his evaluation, Bartram admitted that when meeting with his supervisors he became upset and used obscenities, made reference to having firearms at home, and referred to the suicide of a West Hartford police officer.

Plaintiff Bartram was given a final diagnosis of "adjustment disorder" and was referred to Ten Talcott Notch for a follow-up evaluation.  Plaintiff Bartram was discharged at approximately 10:15 p.m. that same night.

The next morning, plaintiff Bartram left a voicemail message for defendant Assistant Chief Carl Rosensweig, informing him that Bartram would not be coming into work that day or the next, and that he would be taking vacation days for April 18 and 19, 2002. Defendant Assistant Chief Rosensweig had not been involved in the April 17, 2002 decision to transport plaintiff Bartram to the hospital for an evaluation, and was not aware of what had occurred until the next day, when he was briefed by Captain Garewski. Assistant Chief Rosensweig met with Pat Morowsky of the West Hartford Employee Services Department regarding the issue of Brian Bartram's fitness to return to work.  Their first concern was to see if he was emotionally stable, and that it was psychologically appropriate for him to return to work.

-17-

On April 18, 2002, Assistant Chief Rosensweig called plaintiff Bartram at home and informed him that he would need a note from a licensed psychiatrist or psychologist stating that he was not a danger to himself or others before he could return to work. Bartram told Rosensweig that he already had an appointment for the next day at Pathways, a counseling service available to employees, and that he would update the Department on his progress there.

On April 19, 2002, Public Safety Dispatcher Sharon Williams also called Captain Garewski to express her concern about the plaintiff, Brian Bartram.  Sharon sounded upset.  She said that when Bartram had left Captain Garewski's office on April 17, 2002, he came into the ERC and was very upset.  He made a brief reference to Todd Smith and said that he was going to his car.  Bartram told Williams that if he was not back in ten minutes to look for him where Iris was laying, a reference to where Iris Goldfarb had previously passed out.  Sharon told Garewski that at first she thought Brian Bartram was upset and just letting off steam, but after thinking about it she realized maybe he would try to hurt himself.  She said that Brian was a good co-worker and she did not want to see him get hurt.

On April 23, 2002, Assistant Chief Rosensweig called plaintiff Bartram again.  Bartram told Rosensweig that he was working with a licensed psychotherapist, Philip Mays, and expected to be cleared

to return to work by the end of the week or the beginning of the next week.  Bartram asked Rosensweig to call Mays to let him know what was expected regarding the letter authorizing Bartram's return to work, and he did so.

On May 9, 2002, Rosensweig received a letter from Philip Mays stating that plaintiff Bartram was fit for duty, and Bartram returned to work that same day.  However, by correspondence dated May 6, 2002, Bartram had requested a medical leave of absence directly related to side effects from the medication he was taking for the treatment of Hepatitis C.  Therein, he requested the leave to begin in the middle of May and stated that he planned to return again to work on January 1, 2003.  Bartram's request for a medical leave of absence was approved and his leave began on May 25, 2002.

On or about December 19, 2002, Assistant Chief Rosensweig received a letter from Dr. Mark Versland stating that plaintiff Bartram was able to return to work on January 1, 2003.  Bartram returned to work on January 1, 2003, but by correspondence dated January 22, 2003, voluntarily resigned his position effective February 5, 2003.

## LAW AND ARGUMENT

## I.     PLAINTIFF'S FOURTH AMENDMENT CLAIMS FAIL BECAUSE DEFENDANTS HAD PROBABLE CAUSE FOR THEIR ACTIONS.

Plaintiff claims that he was seized against his will in violation of the Fourth Amendment, and also claims a false

imprisonment under state law.

It is well-settled that "[a] Section 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest." Kent v. Kent, 312 F.3d 568, 573 (2d Cir. 2002). Accordingly, a finding of probable cause is a complete defense to an action for false arrest. See, e.g., Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).

"The Fourth Amendment requires that an involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standards." Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993) (internal quotation marks and citations omitted); Williams v. Lopes, 64 F.Supp.2d 37, 43 (D.Conn. 1999). In the instant case, the governing legal standard referred to in Glass has been codified in Connecticut General Statutes §17a-503, which states in pertinent part:

> Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself, herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section.

Conn. Gen. Stat. § 17a-503(a).

In order to prevail on his Fourth Amendment and analogous state law claims, it is plaintiff's indisputable burden to demonstrate the absence of probable cause to believe that the plaintiff was a danger to himself or others. E.g., Ricciuti v. New York City Transit Authority, 124 F.3d 123 (2d Cir. 1997).

Just as the probable cause standard does not require evidence sufficient to support a conviction, United States v. Fisher, 702 F.2d 372, 375 (1985), "a showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." Vallen v. Connelly, 2004 WL 555698 at *8 (S.D.N.Y. March 19, 2004); (internal citations omitted). "Just as actual innocence will not render an arrest invalid if it is based on then-existent probable cause that criminal activity is occurring, a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition." Id. "Because probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts, courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official." Id. (internal quotation marks and citations omitted); See Criss v. City of Kent, 867 F.2d 259, 262-63; Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997).

The uncontroverted evidence shows that the defendants reasonably believed that the plaintiff might be suicidal, and thus a danger to himself or others.

Captain Garewski's concerns about plaintiff Bartram first arose in the early morning of April 17, 2002, when plaintiff's wife Heather came to his office expressing her own concerns about her husband's emotional state. A short while later, Bartram's co-worker Iris Goldfarb expressed her belief that Bartram's concern over his co-worker's activities was making him sick. His concern grew that same afternoon when dispatcher Sonja Vigue reported that Bartram had arrived at work in a highly agitated state, red-faced and yelling, and made an alarming reference to Todd Smith, a West Hartford police officer who had committed suicide by shooting himself in his police cruiser about a year before. Garewski arranged to meet with Bartram as soon as Bartram began his shift, and was not reassured when an argumentative and enraged Bartram, his hands shaking, again referred to the Todd Smith suicide, and said that he felt persecuted.

Wanting additional input as to Bartram's state of mind, Captain Garewski arranged for two additional supervisors, Lt. Lasata and Sergeant Estes, to meet with him and Bartram in the Lieutenants' office. During that meeting, Bartram was again agitated and emotional, and when asked whether he intended to harm

himself, replied, "no, but it would be easy to do.  I have firearms at home, and you remember what happened to Todd Smith."    The fact that Bartram's demeanor and agitation were so out of character for him added to the supervisors' concerns about his repeated references to the Todd Smith suicide, and having firearms at home.

The report of the mental evaluation of the plaintiff performed that night at the John Dempsey Hospital confirms that the plaintiff had an "adjustment disorder", and the plaintiff was referred for a follow-up psychiatric evaluation upon his release.  Moreover, two days later on April 19, 2002, yet another co-worker, Sharon Williams, came forward to express her concern about the erratic behavior she observed Bertram display prior to his evaluation on April 17, 2002, and her concern that he might try to hurt himself. 56(c) Statement #43.

Based on the totality of the circumstances, it was reasonable for defendants Garewski, Lasata and Estes to believe that there was a probability, or at the least a substantial chance, that plaintiff may be a danger to himself or others.  Accordingly, they had probable cause to arrange for him to be transported to a hospital for an evaluation by a professional, and all are entitled to summary judgment in their favor on this issue.

"A seizure permissible under the Fourth Amendment is not unlawful and therefore cannot sustain a claim of false

-23-

imprisonment" under Connecticut law.  <u>Hamilton v. City of New Haven</u>, 213 F.Supp.2d 125, 133 (D.Conn. 2002).  Accordingly, the defendants are entitled to summary judgment on plaintiff's false imprisonment claim as well.

## II.    PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS FAIL BECAUSE DEFENDANTS HAD REASONABLE CAUSE TO BELIEVE THAT THE PLAINTIFF WAS A DANGER TO HIMSELF.

Plaintiff has claimed that the actions of the defendants in referring him to a hospital for an emergency mental health examination violated his Fourteenth Amendment right to be free from deprivations of liberty without due process of law, as well as his Fourth Amendment right to be free from unreasonable search and seizure.

Although claims of unreasonable seizures are generally analyzed under the Fourth Amendment standard, the Second Circuit has found that a claim of involuntary confinement for purposes of a psychiatric evaluation implicates the Fourteenth Amendment's right to be free from deprivations of liberty interests.  See <u>Glass v. Mayas</u>, 984 F.2d 55, 57-58 (2d Cir. 1993); see also <u>Williams v. Lopes</u>, 64 F. Supp. 2d 37, 41-43 (D. Conn. 1999).

It is well-settled that an involuntary civil confinement is a "massive curtailment of liberty", <u>Vitek v. Jones</u>, 445 U.S. 480 491 (1980), and as such cannot be accomplished without due process of law.  See <u>id.</u> at 492; <u>Rodriguez v. City of New York</u>, 72 F.3d 1051,

-24-

1061 (2d Cir. 1995).  In that context, the Supreme Court has held that "a State cannot constitutionally confine without more a non-dangerous individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members."  O'Connor v. Donaldson, 422 U.S. 563, 576 (1975); see also Glass v. Mayas, supra at 57.  "A finding of dangerousness is thus required before a person may be constitutionally deprived of her liberty interest."  Rzayeva v. Foster, 134 F.Supp.2d 239, 248 (D.Conn. 2001).

This dangerousness standard has been incorporated by Connecticut's statute governing emergency mental health examinations.  Id.  It states in pertinent part that:

> Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself, herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section.

Conn. Gen. Stat. § 17a-503(a).  According to an opinion of the Connecticut Attorney General, the decision as to whether reasonable cause exists is a discretionary function which must be exercised by the police officer.  1989 Conn. Op. Atty. Gen. 21, 1989 WL 505889 (Conn.A.G.) at 4, attached as Exhibit N.

As set forth more particularly above, the defendants had reasonable cause to conclude that the plaintiff had "psychiatric

disabilities and [was] dangerous to himself … or others or gravely

disabled, and in need of immediate care and treatment" under

Connecticut General Statute §17a-503.  Accordingly, the actions of

the defendants in causing the plaintiff to be transported to a

hospital for a psychiatric evaluation did not violate his due

process rights under the Fourteenth Amendment, and therefore, the

defendants are entitled to summary judgment as to this claim.

III.    **PLAINTIFF'S SEARCH AND SEIZURE CLAIMS FAIL BECAUSE THE DEFENDANTS HAD PROBABLE CAUSE  TO APPLY FOR THE WARRANT.**

The plaintiff claims that on April 18, 2002, the defendants

"unreasonably applied for and secured a search warrant for the

plaintiff's property without legal cause or factual ground in

violation of the Fourth and Fourteenth Amendments".  Second Amended

Complaint, First Count, paragraphs 27, 31. However, it is

uncontroverted that the search and seizure warrant was prepared,

signed by a judge, and served on April 17, 2002.  Deposition

Transcript of Brian Bartram, pp. 112:21-25, 113:6-25, 114:1-21.

Although the allegations refer collectively to the defendants,

there is no evidence that any defendant other than Sergeant Estes

prepared the arrest warrant application.

It is also uncontroverted that the warrant in question was

issued by a judge of the Connecticut Superior Court.

"Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for an officer to believe that there was probable cause, and the plaintiff who argues that a warrant was issued without probable cause faces a heavy burden." Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991) (arrest warrant) (citations omitted); see also Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991) (search warrant).  "Police activity conducted pursuant to a warrant rarely will require any deep inquiry into reasonableness because a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith."  Simms v. Village of Albion, New York, 115 F.3d 1098, 1106 (2d Cir. 1997) (internal citations omitted).

In the instant case, as set forth above, the defendants had probable cause to refer the plaintiff to a hospital for an emergency mental health evaluation, and were aware that the plaintiff owned a number of firearms. It is abundantly clear that it was reasonable for them to apply for a search and seizure warrant in order to secure the firearms.

Plaintiff also alleges that the search warrant application contained "false fabricated information"...and "failed to disclose that plaintiff had been examined pursuant to Conn. Gen. Stat. §

-27-

17a-503, and had been released immediately following the examination." Second Amended Complaint, para 28.

Plaintiff's complaint fails to specify what "false fabricated information" he is referring to, and there is no evidence that the arrest warrant application contains any information that can be so characterized.

The plaintiff's claim that the defendants failed to disclose in the warrant that the plaintiff had been examined pursuant to C.G.S. § 17a-503, and had been released immediately, is simply absurd, as the defendants could not possibly "disclose" what had not yet occurred. Plaintiff admitted that the search and seizure warrant was both drafted and submitted to a judge while he was still in the hospital being evaluated on April 17, 2002, and that a copy of the served warrant was left at his home with his wife before he had gotten home from the hospital. Deposition Transcript of Brian Bartram, pp. 112:21-25, 113:6-25, 114:1-21.

As there is no evidence to support plaintiff's claim that the arrest warrant application contained false information or omitted any material information, and there was probable cause to apply for the warrant based on the circumstances more specifically described above, the defendants are entitled summary judgment on this claim.

## IV.    CLAIMS AGAINST ROSENSWEIG

It is uncontroverted that the defendant Rosensweig had no part in the events of April 17, 2004, and was not aware of what had transpired until the next day.

In this Circuit, a defendant's personal involvement is generally required in order to establish liability for a constitutional violation. E.g., Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1997). Mere conjectural allegations of and pure speculation about participation in an alleged conspiracy are insufficient to defeat summary judgment. Stern v. Trs. Of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997).

Paragraph 29 of the Second Amended Complaint states in conclusory fashion that "Rosensweig, without reasonable cause, ordered the plaintiff to submit to a "fitness for duty" examination in contravention of the collective bargaining agreement." Just as the complaint fails to specify which section or sections of the collective bargaining agreement were violated, the Plaintiff has proffered no evidence whatsoever of any such contravention. Moreover, when asked what section of his collective bargaining agreement was violated, plaintiff stated "I don't know." Exhibit G, Deposition Transcript of Brian Bartram, p. 301: 5-19.

As there is no evidence that Rosensweig had any involvement whatsoever in the events of April 17, 2002, plaintiff's Fourth and Fourteenth amendment claims fail as to him for this reason as well.

## V.    CLAIMS AGAINST STRILLACCI

When plaintiff amended his complaint to add Chief Strillacci as a defendant, he merely added Strillacci's name to that of the other defendants in paragraphs 14-21 and 24, without adding any factual allegations of his personal involvement in the events alleged.

Despite the plaintiff's bare and conclusory allegations, the evidence establishes that the defendant Strillacci was not directly involved in the events leading up to the plaintiff's evaluation. He was merely briefed on the supervisors' concerns about Bartram, and on the actions they had decided to take, and he merely supported their decision, as his affidavit states.

As the plaintiff has failed to present evidence of a sufficient level of personal involvement in the events complained of, e.g. Wright v. Smith, supra, he is entitled to summary judgment on all claims.  There is no evidence that he had any other role in the events.  Even assuming that a violation of plaintiff's rights could be shown, there is no basis to impute liability to defendant Strillacci for the actions of his subordinates.

Supervisory liability under Section 1983 cannot be based on a theory of *respondeat superior*. <u>Doe v. Spencer</u>, 139 F.3d 107, 11 (2d Cir. 1998), and the plaintiff has presented no evidence to establish that the Chief engaged in any conduct which may engender supervisory liability.

Lastly, assuming arguendo that Strillacci was personally involved in the decision to refer the plaintiff to the hospital, he had reasonable and probable cause for his actions as discussed above, and is therefore entitled to summary judgment on all of plaintiff's claims.

## VI.   AS THE DEFENDANTS HAD PROBABLE CAUSE, THE PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM FAILS AS A MATTER OF LAW.

Given the undeniable existence of probable cause to believe that the plaintiff might be a danger to himself, plaintiff's conclusory allegations regarding conspiracy, retaliation and other malicious motives are simply immaterial.  As the defendants had probable cause to believe that the plaintiff might be a danger to himself or others, his First Amendment claim will fail as a matter of law.  <u>See</u> <u>Singer v. Fulton County Sheriff</u>, 63 F.3d 110, 120 (2d Cir. 1995) (dismissing plaintiff's retaliatory arrest/First Amendment claim because the court "will not examine the officer's underlying motive in arresting and charging the plaintiff" where the arresting officer had probable cause to arrest.); <u>cert</u> <u>denied</u>

517 U.S. 1189 (1996); Mozzochi v. Borden, 959 F.2d 1174, 1179-1180 (2d Cir. 1992)  (qualified immunity shields officer from retaliation claim where a reasonable officer would believe that the arrest was supported by probable cause).

## VII.   THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON ALL CLAIMS.

Even were the foregoing facts and law not sufficient to defeat plaintiff's claims, the defendants are entitled to qualified immunity on all of plaintiff's constitutional claims, as it was objectively reasonable for them to believe that he might be dangerous to himself or others, and was in need of immediate medical evaluation.

Defendants recognize that this Court is well aware of the qualified immunity against liability generally available to municipal officials acting in the discretionary performance of their duties.  This immunity has long been recognized to apply to questions surrounding arrests and the existence of probable cause. E.g., Cartier v. Lussier, 955 F.2d 841 (2d Cir. 1992). Accordingly, defendants will not fully set forth here the policies underlying or the full parameters of the immunity doctrine.

For purposes of this motion, the immunity issue is only reached should the Court have questions about the existence of probable cause for plaintiff's arrest.  In that event, the qualified immunity analysis turns on whether reasonable police

officers could disagree as to the existence of probable cause under the circumstances.  <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986); <u>Lee v. Sandberg</u>, 136 F.3d 94, 102 (2d Cir. 1997).  Thus, "the issue for immunity purposes is not probable cause in fact but 'arguable' probable cause." <u>Lee</u>, <u>supra</u>, quoting <u>Myers v. Morris</u>, 810 F.2d 1437, 1455 (8th Cir. 1987).

"If the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances, summary judgment for the officers is appropriate. <u>Lennon v. Miller</u>, 66 F.3d 416, 421 (2d Cir. 1995). Under the facts of the instant case, where police officers faced what was potentially a life-or-death situation, certainly no rational jury could find that the officers' judgment was so flawed that no reasonable officer would have made a similar choice.  <u>Id.</u> at 424-25.  Especially in view of their acute awareness of the recent firearm suicide of one of their own officers, the defendants cannot be faulted if they erred on the side of caution.  Accordingly, the defendants are entitled to qualified immunity on all of plaintiff's claims.

**VIII.  PLAINTIFF HAS NO ACTIONABLE CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

Plaintiff has no actionable claim for intentional infliction of emotional distress because the alleged conduct of the defendants

fails to meet the "extreme and outrageous" standard necessary to maintain such a claim.

Under Connecticut law, in order to establish a claim for intentional infliction of emotional distress, plaintiff must allege: 1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of the conduct; 2) that the conduct was extreme and outrageous; 3) that the defendants' conduct was the cause of the plaintiff's distress; and 4) that the emotional distress was severe. DeLaurentis v. New Haven, 220 Conn. 225, 266-67 (1991).

"In order to state a cognizable cause of action, Plaintiff must not only allege each of the four elements, but must also allege facts to support them." Whitaker v. Haines Constr. Co., 167 F.Supp.2d 251, 254 (D.Conn 2001).

The "extreme and outrageous" standard requires the plaintiff to show that the defendants' conduct exceeded "all bounds usually tolerated by decent society, or of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind". Ancona v. Manafort Brothers, 56 Conn. App. 701 (2000). The conduct must be such that an average member of the community would be so aroused to anger as to be caused to exclaim "Outrageous!" See Carroll v. Ragaglia, 292 F.Supp.2d 324, 344 (D.Conn. 2003)(internal citations omitted).

The court determines as a matter of law whether the possibility of a finding of extreme and outrageous conduct exists. Williams v. Perry, 960 F.Supp. 534, 541 (D.Conn. 1996); Ziobro v. Conn. Institute for the Blind, 818 F. Supp. 497, 502 (D. Conn. 1993). Both Connecticut state courts and "federal district courts in the Second Circuit have interpreted the qualification of extreme and outrageous activity strictly." Whitaker, 167 F.Supp.2d at 255.

As set forth in detail above, the defendants' conduct was reasonable, and there was probable cause for their actions. Accordingly, it is clear that none of the defendants acted in a manner that rises to the level of the "extreme and outrageous" conduct necessary to maintain such a claim.  Further, there is no evidence of any conduct by any of the defendants that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Ziobro, 818 F. Supp. at 502 (quoting Restatement (2d) of Torts, § 46(d) 1965). Accordingly, plaintiff's claim of intentional infliction of emotional distress fails and defendants are entitled to summary judgment on this claim.

## IX.    THE PLAINTIFF HAS FAILED TO STATE OR PROVE A CLAIM IN DEFAMATION.

In the Third Count, plaintiff claims that he was defamed by the defendants.

Under Connecticut law, liability for defamation requires the plaintiff to establish that the defendants (1) published false statements (2) that harmed the plaintiff, and (3) that the defendants were not privileged to do so.  Kelly v. Bonney, 221 Conn. 549, 563 (1992).

Although the Second Circuit does not require *in haec verba* pleading of defamation claims, it is required through Federal Rule of Civil Procedure 8 "that the complaint 'afford defendant sufficient notice of the communications complained of to enable him to defend himself.'"  Kelly v. Scmidberger, 806 F.2d 44, 46 (2d Cir. 1986) (internal citations omitted).

Accordingly, the plaintiff is required to plead "what defamatory statements...were made concerning the plaintiff, when they were made, [and] to whom they might have been made." Bramesco v. Drug Computer Consultants, 834 F.Supp.120, 122 (S.D.N.Y., 1993) (pro se complaint alleging defamation insufficient as plaintiff failed to "plead adequately the actual words spoken, publication or special damages"), cert. denied, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed. 459 (1991); Wanamaker v. Columbia Rope Co., 713 F. Supp. 533, 545 (N.D.N.Y. 1989) (dismissing defamation claim because plaintiff failed to specify who made the statements, when they were made and in what context, whether made to third party and whether they were written or oral), aff'd, 108 F.3d 462 (2d Cir. 1997).

-36-

In the instant case, the deficiency of the allegations is clear.  Plaintiff's claim consists entirely of his vague and conclusory statements that the "defendants slandered and defamed plaintiff by publishing the false and defamatory statements that plaintiff was a "mental case" and that he was dangerous to himself or others.  Second Amended Complaint, Third Count, para 22. Plaintiff fails to specify each of the actionable misstatements, who made each such statements, the context in which the statements were made, to whom they were communicated, and whether they were written or oral.  As it is clear that plaintiff's complaint fails to even state a defamation claim for which relief may be granted, summary judgment should be entered on that basis alone.

Even if plaintiff's complaint has stated a claim in defamation, the claim necessarily fails on other grounds.

"To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion."  Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 795-96 (1992).  See Hotchner v. Castillo-Puche, 551 F.2d 910, 913 (2d Cir. 1997) ("[a] writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be").

To the extent that plaintiff's claim is based on the defendants' allegedly expressed belief that plaintiff may have been

a "danger to himself or others", para. 22, it necessarily fails as a matter of law, because such a statement is one of opinion and not a statement of fact.  Moreover, to the extent that plaintiff's claim is based on plaintiff's allegation that any defendant published the statement that plaintiff was a "mental case" (also a statement of opinion), the plaintiff has admitted that there is no evidence whatsoever to suggest that any such statement(s) were made.  In fact, during his deposition, the plaintiff conceded that he was not aware of any derogatory comments made by anyone, or by any of his co-workers, regarding his mental or emotional status after April 17, 2002.  Exhibit G, Deposition Transcript of Brian Bartram, pp. 328:23-25-329:1.  Moreover, when the plaintiff was specifically asked "Were there any derogatory statements made by any of the defendants about plaintiff's mental or emotional status on or after the date of the incident?", he answered "No".  Exhibit G, Deposition Transcript of Brian Bartram, p. 329:2-5.

    As plaintiff has clearly failed to state or prove a claim in defamation, the defendants are entitled to summary judgment on the Third Count as well.

**<u>CONCLUSION</u>**

Plaintiff can establish no basis whatever for liability of any of these defendants, based upon the undisputed material facts and established principles of applicable law.  Accordingly, these defendants request their motion be granted and summary judgment enter in their favor on all claims by plaintiff.

                              DEFENDANTS, CARL ROSENSWEIG,
                              J.A. GAREWSKI, JOSEPH LASATA,
                              STEPHEN B. ESTES and JAMES
                              STRILLACCI


                         BY_____
                            Marcia J. Gleeson
                            Federal Bar No.: ct05303
                            Scott M. Karsten
                            Federal Bar No: ct05277
                            Sack Spector and Karsten
                            836 Farmington Avenue
                            West Hartford, CT 06119
                            mgleeson@sackspec.com
                            Their Attorneys

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, this 1st day of June, 2004, to the following counsel of record:

James S. Brewer, Esquire
818 Farmington Avenue
West Hartford, CT 06119

_____
Marcia J. Gleeson