FILED

2004 JUN -3 P 4: 09

US DISTRICT
DISTRICT...

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIAN BARTRAM,                          :    NO.: 3:02CV2148(SRU)
      Plaintiff,

vs.

TOWN OF WEST HARTFORD, CARL
ROSENSWEIG, J.A. GAREWSKI,
JOSEPH LASATA and STEPHEN B.
ESTES,                                  :    JUNE 3, 2004
      Defendants.

## LOCAL RULE 56(a) STATEMENT

1.    At all relevant times, plaintiff Brian D. Bartram was a duly appointed Public Safety Dispatcher with the Town of West Hartford Police Department.  Second Amended Complaint, ¶ 5.

2.    At all relevant times, defendant James Strillacci was the Chief of Police of the West Hartford Police Department. Second Amended Complaint, ¶ 2.

3.    At all relevant times, defendant Carl Rosensweig was an Assistant Chief of Police at the West Hartford Police Department. Second Amended Complaint, ¶ 3.

4.   At all times relevant, defendant Jeffrey Garewski was a Captain with the West Hartford Police Department.  Second Amended Complaint, ¶ 4.

5.   At all relevant times, defendant Joseph Lasata was a Lieutenant with the West Hartford Police Department.  Second Amended Complaint, ¶ 3 (sic).

6.   At all relevant times, defendant Stephen Estes was a Sergeant with the West Hartford Police Department. Second Amended Complaint, ¶ 4 (sic).

7.   At all times relevant Heather Bartram was the plaintiff's wife, and was employed as a Public Safety Dispatcher with the West Hartford Police Department.  Exhibit G, Deposition Transcript of Brian Bartram, pp. 8:18-19; 70:4-7.

8.   At all relevant times, Sonja Vigue was employed as a Public Safety Dispatcher with the West Hartford Police Department. Exhibit F, Affidavit of Sonja Vigue, ¶ 3.

9.   During the fall of 1998, plaintiff Brian Bartram was diagnosed with Hepatitis C.  On December 27, 2001, he began a forty-eight week course of Interferon treatment for the Hepatitis

-2-

C.  Prior to beginning the treatment, his doctor warned him of a number of potential side effects from that course of medication, including sleep disturbances, anemia, and in rare cases, suicidal or homicidal tendencies.  His doctor further recommended that he take an antidepressant, Paxil, during the treatment.  Exhibit J, Brian Bartram Letter dated May 6, 2002; Exhibit G, Deposition Transcript of Brian Bartram, pp. 55-57; 184: 21-25; 185:1.

10.  Before even beginning the treatments, Bartram made an agreement with his wife Heather that if any ill effects from the medication gave him or his wife any cause for concern about having seventeen firearms in their home, the firearms would be transferred to his brother-in-law for safe keeping.  Plaintiff Bartram did experience various side effects from the Hepatitis C treatments, including loss of sleep, loss of appetite, anemia, extreme shortness of breath, extreme fatigue and irritability.  The plaintiff was concerned enough about the side effects to send his two children to live with their grandparents in Florida for the months of February, March and April, 2002.  Exhibit G, Deposition

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE., SUITE 221•WEST HARTFORD, CT 06119-1544•(860) 233-8251•JURIS NO. 52776

Transcript of Brian Bartram, pp. 36: 18-25, 37: 1-18; 24: 7-25; 55-57; 58: 12-21.

11.  Plaintiff Bartram did not tell anyone in the West Hartford police administration, or any of his supervisors, about the fact that he was diagnosed with Hepatitis C or that he was undergoing a course of medication which caused numerous side effects.  The only co-workers he informed about the Hepatitis C and his course of medication were Todd Hungerford and Sue MacDonald, his two closest friends at the police department.  He informed them in late December, 2001, and asked them to keep the information confidential.  Bartram discussed his concerns about the side effects of the medication with Hungerford and MacDonald, so that they could notify him if they noticed any problems or decline in his work.  Exhibit G, Deposition Transcript of Brian Bartram, pp. 203: 6-13; 59: 12-14; 62: 23; 75: 11-15; 184: 25-185: 14; 60-62; 148: 2-7.

12.  Toward the end of March 2002, plaintiff Bartram learned that these two close friends, Todd Hungerford and Sue MacDonald, were having an affair.  Bartram felt wounded by the affair and

-4-

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE., SUITE 221•WEST HARTFORD, CT 06119-1544•(860) 233-8251•JURIS NO. 52776

reacted badly to it.  He stopped speaking to them and vice versa.

Despite his concerns, plaintiff Bartram never complained to any of

his supervisors or to any of the defendants regarding the affair or

its effect on communications in the workplace, before April 17,

2002.  Exhibit G, Deposition Transcript of Brian Bartram, pp. 270-

273:3; 318: 14-25; 319: 1-11.

13.  In the early morning hours of April 17, 2002, the

plaintiff's wife, Heather, who was also employed by the West

Hartford Police Department as a Public Safety Dispatcher, went to

defendant Captain Garewski's office and asked to talk.  She was

very emotional.  She told Captain Garewski that plaintiff was upset

about a personal relationship that had developed between two co-

workers, Sue MacDonald and Todd Hungerford, and the alleged

affair's effect on relationships within the ERC.  She said that the

plaintiff was not doing very well with the situation and in

addition had a personal health situation that he was dealing with.

She also said that the plaintiff was not eating and was having

trouble sleeping.  Captain Garewski told Heather that he would

speak with the involved parties and suggested that Brian seek some

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE., SUITE 221•WEST HARTFORD, CT 06119-1544•(860) 233-8251•JURIS NO. 52776

assistance from Pathways, a counseling service available to

employees, to deal with his personal issues. Heather said that she

would mention it to the plaintiff when she got home. Exhibit A,

Affidavit of Jeffrey Garewski, ¶¶ 4, 5.

14. Later that morning, Captain Garewski went to the ERC to

talk to personnel there. Dispatchers Iris Goldfarb and Sharon

Williams were present. Iris immediately raised some personal

issues relating to a conflict with another dispatcher, Carol, and

complained that Carol was spreading lies about what was going on in

ERC. Iris also said that the Sue MacDonald/Todd Hungerford

situation was making her uncomfortable. Iris then stated that she

felt that Brian Bartram was becoming ill because of Carol's lies

and the Sue and Todd relationship. Captain Garewski told Iris that

the first he heard of this was earlier that morning when Heather

referred to it, asked Iris why it took several months to report the

situation to a supervisor, and told her that any concerns should

have been reported as soon as they occurred so that they could have

been handled immediately. He also told her that he would address

-6-

the issue with both Sue and Todd Hungerford.  Exhibit A, Affidavit
of Jeffrey Garewski, ¶¶ 6,7.

15.  Iris said that she needed a breath of fresh air and then
she walked outside to the ERC courtyard.  About an hour later,
Captain Garewski heard a radio call that an ambulance was needed in
the rear courtyard.  He responded to where Iris was being treated
by medical personnel and learned that she had apparently passed
out.  Exhibit A, Affidavit of Jeffrey Garewski, ¶ 8.

16.  On that same afternoon at approximately 1:00 p.m.
plaintiff Bartram called the ERC and was told by dispatcher Sonja
Vigue that their co-worker, Iris Goldfarb, had evidently passed out
and had been taken to the hospital.  Exhibit F, Affidavit of Sonja
Vigue, ¶ 5; Exhibit G, Deposition Transcript of Brian Bartram, p.
149: 22-25; p. 150: 1-9.

17.  Thereafter, at approximately 2:30-2:45 p.m., plaintiff
Bartram came into the ERC highly agitated, red-faced and yelling.
He was sputtering things like, "They better talk to me.  They
talked to everybody else.  Nobody's talked to me.  They didn't talk
to Todd Smith and look what happened."  Dispatcher Sonja Vigue, who

-7-

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE., SUITE 221•WEST HARTFORD, CT 06119-1544•(860) 233-8251•JURIS NO. 52776

was working in the ERC, heard the remarks and, after thinking about it for a bit, felt that the statement about Todd Smith was a "red flag" and a "cry for help", as Todd Smith was a West Hartford police officer who had shot and killed himself in his police cruiser about a year before.  Exhibit F, Affidavit of Sonja Vigue, ¶¶ 6-9.

18.  At approximately 3:30 p.m. dispatcher Sue MacDonald came to Captain Garewski's office at his request.  Captain Garewski told her that he wanted to discuss some issues that had been brought to his attention, and asked her about her current relationship with Brian Bartram.  Sue said that she and Brian used to be good friends, but that since he became aware of her relationship with Todd Hungerford, he had become increasingly difficult to work with and had refused to talk to her.  When she tried to reach out to him about this, his response was a profanity.  Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 9, 10.

19.  While Captain Garewski was talking to Sue MacDonald, he received a telephone call from Dispatcher Sonja Vigue, who had just gotten off work.  Sonja expressed to Garewski her serious concerns

-8-

about the plaintiff, whom she had interacted with a short while before, and asked if Captain Garewski was planning to talk with plaintiff. Sonja told Captain Garewski that "He really wants to talk to you. He is talking about Todd Smith and I don't know what he is going to do." Captain Garewski told Sonja that plaintiff had made similar remarks in the presence of others that day, including himself, and he assured Sonja that he would talk to the plaintiff. Exhibit A, Affidavit of Jeffrey Garewski, ¶ 11.

20. Shortly thereafter, Captain Garewski asked the plaintiff to come to his office. He did so at approximately 4:00 p.m. and he immediately asked Captain Garewski if he needed a "union rep". Captain Garewski told plaintiff that he was merely aware that the plaintiff wanted to talk and that the meeting was in no way disciplinary. Captain Garewski told plaintiff that he was looking into several alleged problems in the ERC and that he wanted to know how the plaintiff felt about it. Plaintiff Bartram was immediately argumentative and seemed infuriated with the relationship between Sue MacDonald and Todd Hungerford. The plaintiff said that something had better be done about that relationship right away or

-9-

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE., SUITE 221•WEST HARTFORD, CT 06119-1544•(860) 233-8251•JURIS NO. 52776

he was going to have an attorney file suit against the administration for allowing a "sexually charged workplace".  The plaintiff said that he could not work with Sue and Todd Hungerford and that he had been taking vacation and comp time so that he would not have to work with them, and that working with them was making him sick.  Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 12-13.

21.  At this point the plaintiff was enraged.  His hands were shaking.  The plaintiff told Captain Garewski that he had some health issues, and that he had been losing weight and not sleeping since his co-workers' relationship started.  As Captain Garewski tried to calm the plaintiff down, he became louder and kept cutting him off.  The plaintiff acknowledged that he was aware of Captain Garewski's conversation with his wife earlier that morning, and of Captain Garewski's suggestion that the plaintiff speak with a counselor at Pathways.  He then told Captain Garewski, his supervisor, "It's nobody's fucking business who I talk to." Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 15-16; Exhibit G, Deposition Transcript of Brian Bartram, pp. 185: 20-25; 186: 1-6.

-10-

22.  Plaintiff repeated that Sue and Todd Hungerford would not talk to him, and that they had created a hostile workplace that he could not work in.  He specifically told Captain Garewski, "I want them to talk to me.  It took everyone too long to talk to Todd Smith."  The plaintiff continued to be very upset and to use profanity.  He repeated that he would not work with Sue MacDonald and Todd Hungerford and had arranged his work schedule so that he would never have to talk to them again.  Garewski told plaintiff that this may be an uncomfortable situation for him and others, but that the plaintiff seemed to be the most unyielding about the matter.  Plaintiff Bartram became even more upset than before and said that he was being "persecuted".  When Captain Garewski told him that the conversation was over and asked him to leave, Bartram slammed the crash bars on the door as he went down the stairs. Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 16-19; Exhibit G, Deposition Transcript of Brian Bartram, p. 196: 8-15.

23.  The agitation and demeanor displayed by the plaintiff during the meeting were especially disturbing to Captain Garewski because he felt that both were very out of character for the

-11-

plaintiff, whom he had previously always found to be courteous, cooperative and respectful.  Exhibit A, Affidavit of Jeffrey Garewski, ¶ 22.

24.  That same afternoon of April 17, 2002, defendant Sergeant Stephen Estes was on duty when plaintiff Bartram came into the first floor hallway from upstairs.  Before Sergeant Estes could greet him, plaintiff Bartram conspicuously glared at him and marched down the hallway in a forceful manner, and appeared to Estes to be in an emotional and agitated state.  Exhibit C, Affidavit of Stephen Estes, ¶ 4.

25.  Captain Garewski then called the plaintiff's immediate supervisor, Lt. Lasata, and told him about the meeting and of his concern about the plaintiff's physical and mental health. Defendant Captain Garewski also told Lt. Lasata that plaintiff had made some comments which Garewski believed to indicate that Bartram was possibly suicidal.  Captain Garewski asked defendant Lt. Lasata what other supervisor was working, and was informed that Sergeant Estes was.  Lt. Lasata told Captain Garewski that the plaintiff had gone out to his car and agreed to let Captain Garewski know when

-12-

the plaintiff returned.  Captain Garewski briefly filled Chief

Strillacci in on what had happened.  Exhibit A, Affidavit of

Jeffrey Garewski, ¶¶ 20-21; Exhibit B, Affidavit of Joseph Lasata,

¶ 4; Exhibit E, Affidavit of James Strillacci, ¶ 4.

26.  Shortly thereafter, plaintiff was requested to join

Garewski, Lasata and Estes in the Lieutenants' office.  During the

meeting, plaintiff Bartram's voice was raised, he was agitated and

emotional.  Plaintiff Bartram was asked if he felt alright and if

he wanted to go home.  Bartram said that he did not want to go home

and that he felt fine, but mentioned again that he felt persecuted.

Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 23-24; Exhibit B,

Affidavit of Joseph Lasata, ¶ 7; Exhibit C, Affidavit of Stephen

Estes, ¶ 6.

27.  Captain Garewski asked plaintiff Bartram if he had any

firearms with him or in his car and he replied that he did not.

Captain Garewski asked if him if he was thinking of hurting himself

and he replied, "No, but it would be easy to do because I have

firearms at home.  You remember what happened to Todd Smith."

Exhibit A, Affidavit of Jeffrey Garewski, ¶ 25; Exhibit B,

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE., SUITE 221•WEST HARTFORD, CT 06119-1544•(860) 233-8251•JURIS NO. 52776

Affidavit of Joseph Lasata, ¶ 8; Exhibit C, Affidavit of Stephen
Estes, ¶ 6; Exhibit M, Police Report, Emergency Committal, dated 4-
17-02.

28.    Captain Garewski, Lt. Lasata and Sergeant Estes were each
very concerned about plaintiff Bartram's reference to Todd Smith,
and to having firearms at home.  All three were well aware that
Todd Smith was a West Hartford police officer who had committed
suicide with a firearm on duty approximately a year before.  Based
on plaintiff Bartram's emotional state, his statement about Todd
Smith, and his reference to having firearms at home, the three
supervisors each believed he might be suicidal.  Exhibit A,
Affidavit of Jeffrey Garewski, ¶¶ 22-26; Exhibit B, Affidavit of
Joseph Lasata, ¶ 7-9; Exhibit C, Affidavit of Stephen Estes, ¶ 7-9.

29.    After conferring in private, the three determined that
the safest thing they could do for plaintiff Bartram and everyone
else was to send him to a hospital for an evaluation by a
professional, as allowed under state law.  Lt. Lasata then went to
the ERC and asked the only dispatcher working, Sue MacDonald, to
call an ambulance, "code two", which means no lights or sirens,

-14-

which she did by telephone.  As requested by Captain Garewski, the ambulance was instructed to meet them in the back of the police department to keep things as low key as possible.  Exhibit A, Affidavit of Jeffrey Garewski, ¶ 27-28; Exhibit B, Affidavit of Joseph Lasata, ¶ 10-13; Exhibit C, Affidavit of Stephen Estes, ¶ 9.

30.  Captain Garewski then briefed Chief Strillacci on the three defendant supervisors' concerns about Bartram and on the actions they had decided to take, and the Chief supported their decision.  Exhibit A, Affidavit of Jeffrey Garewski, ¶ 29.

31.  Sergeant Estes informed plaintiff Bartram that they were arranging for him to be transported to a hospital for an evaluation.  After being told this, plaintiff became calm and cooperative.  Bartram asked if he could first change out of his uniform, so Sergeant Estes stood by while he did so.  Plaintiff Bartram also asked Estes who would pay for the evaluation, and whether it would cause the state police to take away his pistol permits.  At no time did he question the decision or resist the officers in implementing their decision.  Exhibit C, Affidavit of Stephen Estes, ¶¶ 10, 12; Exhibit G, Deposition Transcript of Brian

-15-

Bartram, pp. 178: 3; 179: 1-12; Exhibit M, Police Report, Emergency Committal, dated 4-17-02.

32.  Sergeant Estes prepared a police emergency examination request pursuant to C.G.S. § 17a-503, on a Department of Mental Health and Addiction Services form, which he gave to the responding EMT's.  Exhibit C, Affidavit of Stephen Estes, ¶ 11; Exhibit G, Deposition Transcript of Brian Bartram, pp. 178: 3; 179: 1-12; Exhibit L, Police Emergency Examination Request; Exhibit M, Police Report, Emergency Committal, dated 4-17-02.

33.  Bartram was not physically restrained in any way, and he walked cooperatively to the ambulance.  Plaintiff did refuse to answer the EMT's when they asked him for his pertinent medical information.  The ambulance then left for the John Dempsey Hospital at the University of Connecticut.  Exhibit C, Affidavit of Stephen Estes, ¶ 12; Exhibit G, Deposition Transcript of Brian Bartram, p. 180: 7-19; Exhibit M, Police Report, Emergency Committal dated 4-17-02.

34.  In view of Bartram's statement of having firearms at home, an application for a search and seizure warrant was then

-16-

prepared in order to secure all of Bartram's firearms for his safety, and that of others.  Once the application was completed, Sergeant Estes called Assistant State's Attorney John O'Reilly. Sergeant Estes read the body of the search and seizure warrant to O'Reilly, explained what had taken place, and answered O'Reilly's various questions.  O'Reilly verbally approved the warrant, and said that it was alright to present it to a judge.  Exhibit C, Affidavit of Stephen Estes, ¶ 13-14; Exhibit I, Search and Seizure Warrant; Exhibit M, Police Report, Follow-up, dated 4-17-02.

35.    Sergeant Estes and Sergeant Tom Traskos then went to the home of Superior Court Judge Rubinow, who signed the warrant at approximately 9:15 p.m.  The warrant authorized them to search plaintiff Bartram's automobiles and his Suffield, Connecticut residence for firearms.  Suffield Police Department was then notified that they would be executing a search and seizure warrant in Suffield's jurisdiction.  Exhibit C, Affidavit of Stephen Estes, ¶ 15-16; Exhibit I, Search and Seizure Warrant; Exhibit M, Police Report, Follow-up dated 4-17-02.

-17-

36.   At approximately 10:30 p.m., Sergeant Estes went to the
Bartram residence in Suffield together with Sergeant Traskos,
Detectives Semper and Nelson, and Sergeant Huntley of the Suffield
Police Department.  Plaintiff's wife, Heather Bartram, answered the
door and allowed the police officers to enter the premises.
Heather told them that after a telephone conversation with
plaintiff Bartram at the hospital, she had given the guns to a
relative, Greg Gardner, approximately one half hour prior to their
arrival.  (Although she did not tell the officers this, she had
made this arrangement in accordance with the plan she and her
husband had agreed to before he commenced the Hepatitis C
medication regimen.)  The officers searched the residence and found
ammunition and magazines, but no guns.  Exhibit C, Affidavit of
Stephen Estes, ¶ 17-19; Exhibit G, Deposition of Brian Bartram, pp.
36: 18-25; 37: 1-18; Exhibit I, Search and Seizure Warrant; Exhibit
M, Police Report, Follow-up dated 4-17-02.

37.   After they completed their search, Heather talked to them
about plaintiff Bartram.  She confirmed that Bartram was having
both physical and mental health issues, and that she had had a long

-18-

conversation with him regarding Todd Smith's suicide.  Heather also
told them that Brian was on an anti-depressant medicine.  As the
police officers were leaving, Heather told them that plaintiff
Bartram had called her from the hospital just as they were there
and said that the hospital would be releasing him.  Exhibit C,
Affidavit of Stephen Estes, ¶¶ 20-21; Exhibit I, Search and Seizure
Warrant; Exhibit M, Police Report, Follow-up dated 4-17-02.

38.  Meanwhile, plaintiff Bartram had arrived at the John
Dempsey Hospital at 6:22 p.m.  The hospital consultation report
states that "pt is a 33 year old male presents to ED on police
emergency certificate for evaluation for suicidality.  Patient has
been having difficulties with his colleagues at work.  He recently
found out his two good friends are having an affair and has stopped
talking to them.  For the past three weeks he has been upset at the
conflict at work for he continues to have to work with them in the
same room.  Today the sergeant tried to talk with him and asked him
if he could reconcile and he got upset and started to say
obscenities.  He was questioned about suicidal ideation and patient
stated that he was not, and he understood why they were asking,

-19-

because of another cop that had committed suicide and when asked if he had guns stated 'at home'." The notes further indicate that the plaintiff Bartram acknowledged having suicidal ideation in high school due to depression. Exhibit H, John Dempsey Hospital Report.

39. During his evaluation, Bartram admitted that when meeting with his supervisors he became upset and used obscenities, made reference to having firearms at home, and referred to the suicide of a West Hartford police officer. Exhibit H, John Dempsey Hospital Report; Exhibit G, Deposition Transcript of Brian Bartram, pp. 190-193: 8.

40. Plaintiff Bartram was given a final diagnosis of "adjustment disorder" and was referred to Ten Talcott Notch for a follow-up evaluation. Plaintiff Bartram was discharged at approximately 10:15 p.m. that same night. Exhibit H, John Dempsey Hospital Report; Exhibit G, Deposition Transcript of Brian Bartram, pp. 192: 23-25; 193: 1-8.

41. The next morning, plaintiff Bartram left a voicemail message for defendant Assistant Chief Carl Rosensweig, informing him that Bartram would not be coming into work that day or the

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE., SUITE 221•WEST HARTFORD, CT 06119-1544•(860) 233-8251•JURIS NO. 52776

next, and that he would be taking vacation days for April 18 and 19, 2002.  Defendant Assistant Chief Rosensweig had not been involved in the April 17, 2002 decision to transport plaintiff Bartram to the hospital for an evaluation, and was not aware of what had occurred until the next day, when he was briefed by Captain Garewski.  Assistant Chief Rosensweig met with Pat Morowsky of the West Hartford Employee Services Department regarding the issue of Brian Bartram's fitness to return to work.  Their first concern was to see if he was emotionally stable, and that it was psychologically appropriate for him to return to work.  Exhibit D, Affidavit of Carl Rosensweig, ¶¶ 5-7.

42.  On April 18, 2002, Assistant Chief Rosensweig called plaintiff Bartram at home and informed him that he would need a note from a licensed psychiatrist or psychologist stating that he was not a danger to himself or others before he could return to work.  Bartram told Rosensweig that he already had an appointment for the next day at Pathways, a counseling service available to employees, and that he would update the Department on his progress there.  Exhibit D, Affidavit of Carl Rosensweig, ¶ 9.

-21-

43.  On April 19, 2002, Public Safety Dispatcher Sharon Williams also called Captain Garewski to express her concern about the plaintiff, Brian Bartram.  Sharon sounded upset.  She said that when Bartram had left Captain Garewski's office on April 17, 2002, he came into the ERC and was very upset.  He made a brief reference to Todd Smith and said that he was going to his car.  Bartram told Williams that if he was not back in ten minutes to look for him where Iris was laying, a reference to where Iris Goldfarb had previously passed out.  Sharon told Garewski that at first she thought Brian Bartram was upset and just letting off steam, but after thinking about it she realized maybe he would try to hurt himself.  She said that Brian was a good co-worker and she did not want to see him get hurt.  Exhibit A, Affidavit of Jeffrey Garewski, ¶ 30.

44.  On April 23, 2002, Assistant Chief Rosensweig called plaintiff Bartram again.  Bartram told Rosensweig that he was working with a licensed psychotherapist, Philip Mays, and expected to be cleared to return to work by the end of the week or the beginning of the next week.  Bartram asked Rosensweig to call Mays

-22-

to let him know what was expected regarding the letter authorizing Bartram's return to work, and he did so.  Exhibit D, Affidavit of Carl Rosensweig, ¶ 10.

45.  On March 9, 2002, Rosensweig received a letter from Philip Mays stating that plaintiff Bartram was fit for duty, and Bartram returned to work that same day.  However, by correspondence dated May 6, 2002, Bartram had requested a medical leave of absence directly related to side effects from the medication he was taking for the treatment of Hepatitis C.  Therein, he requested the leave to begin in the middle of May and stated that he planned to return again to work on January 1, 2003.  Bartram's request for a medical leave of absence was approved and his leave began on May 25, 2002.  Exhibit D, Affidavit of Carl Rosensweig, ¶¶ 11-14.

47.  On or about December 19, 2002, Assistant Chief Rosensweig received a letter from Dr. Mark Versland stating that plaintiff Bartram was able to return to work on January 1, 2003.  Bartram returned to work on January 1, 2003, but by correspondence dated January 22, 2003, voluntarily resigned his position effective

-23-

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE., SUITE 221•WEST HARTFORD, CT 06119-1544•(860) 233-8251•JURIS NO. 52776

February 5, 2003.  Exhibit D, Affidavit of Carl Rosensweig, ¶¶ 15-17.

> DEFENDANTS, CARL ROSENSWEIG,
> J.A. GAREWSKI, JOSEPH LASATA,
> STEPHEN B. ESTES and JAMES
> STRILLACCI
>
> BY _____
> Marcia J. Gleeson
> Federal Bar No.: ct05303
> Scott M. Karsten
> Federal Bar No: ct05277
> Sack Spector and Karsten
> 836 Farmington Avenue
> West Hartford, CT 06119
> mgleeson@sackspec.com
> Their Attorney

-24-

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been mailed, postage prepaid, this 3rd day of June, 2004, to the following counsel of record:

James S. Brewer, Esquire
818 Farmington Avenue
West Hartford, CT 06119

Marcia J. Gleeson

-25-

**SACK, SPECTOR AND KARSTEN, LLP** • *ATTORNEYS AT LAW*
836 FARMINGTON AVE., SUITE 221 • WEST HARTFORD, CT 06119-1544 • (860) 233-8251 • JURIS NO. 52776