UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


| | | |
|---|---|---|
| BRIAN BARTRAM, | : | CIVIL ACTION NO. |
| PLAINTIFF, | : | 3:02CV2148(SRU) |
| | : | |
| v. | : | |
| | : | |
| TOWN OF WEST HARTFORD, ET AL | : | |
| DEFENDANTS | : | AUGUST 6, 2004 |


**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**


The defendants have filed a Motion for Summary Judgment against the plaintiff's

complaint.  The plaintiff now submits this memorandum in opposition to the defendants' Motion

for Summary Judgment.

**I.     PRELIMINARY STATEMENT**

This action is brought by plaintiff against defendants, who acting under color of state

law, charter, ordinance, regulation, custom or usage, unlawfully violated plaintiff's civil and due

process rights, and intentionally retaliated against him in violation of the First, Fourth and

Fourteenth Amendments to the United States Constitution.  Plaintiff brings this action for state

common law claims of false imprisonment, defamation, and intentional infliction of emotional

distress.  This action arises under Title 42 U.S.C. § 1983, The Fourth and Fourteenth

Amendments to the United States Constitution, and the common law of the State of Connecticut

for false imprisonment, defamation and intentional infliction of emotional distress.

1

II.     **STATEMENT OF FACTS**

At all times relevant, the plaintiff, Brian Bartram was a dispatcher at the West Hartford Police Department.   His wife, Heather Bartram, was also a dispatcher at the West Hartford Police Department.  Brian was good friends with two other dispatchers, Todd Hungerford and Susan MacDonald.  In March, 2002, Todd Hungerford and Susan MacDonald, had an extramarital affair that created conflicts and communication problems in the Emergency Response Center (hereinafter "ERC") for Brian and the other dispatchers.

The patrol Captain, Captain Garewski, was the responsible for the ERC.  It is a high pressure environment in the ERC and communication and cooperation is very important between the police department and the ERC and if people are not communicating with one another it could be a danger to the public or to officers.  Sue MacDonald and Todd Hungerford flirted with each other in the ERC and in front of ERC staff.

A complaint had been made to Captain Garewski prior to April 17, 2002, regarding a pair of G-String underwear that were found in the unisex bathroom and were later determined to be Sue MacDonald's underwear.  The West Hartford Police Department and the ERC had a history of conflicts where supervisors would turn their backs to the problem and ignore the conflict.

During First Shift, on April 17, 2002, dispatcher, Iris Goldfarb, lost consciousness outside the Police Department in the Courtyard for approximately 30 minutes and was taken by ambulance to John Dempsey Hospital at the UConn Medical Center (hereinafter "Hospital").

Prior to arriving for his shift that starts at 3:30 p.m., Brian was notified of Goldfarb's illness and purchased flowers for her and fellow dispatcher Sharon Williams, who found

Goldfarb unconscious, on his way into work.  At approximately 3:00 p.m., Brian arrived at the ERC, he obtained directions to Goldfarb's house and gave Williams her flowers.  Brian delivered the flowers to Goldfarb at her house.

When Brian arrived back at the ERC after delivering flowers to Goldfarb, Garewski called Brian to his office.  Brian told Garewski about the problems in the ERC including the lack of communication between the dispatchers and complained that the atmosphere jeopardized public safety.  Garewski told Brian that the conflicts in the ERC were not the department's concern.  Garewski told Brian that he was the only dispatcher who was not cooperating with him and told Brian that he could excuse himself from the meeting.  During Brian's meeting with Garewski, Brian did not yell or use profanity toward Garewski during the meeting.

Garewski testified that his reason for calling Brian to his office at 4:00 p.m. was because he was "concerned about Brian and I knew that I had to talk to Brian to see what was wrong down there . . . I didn't want to let Brian get started with work if he was all upset I wanted to get him as quickly as I could. . . ."  Brian started his shift with Susan MacDonald at 3:30 p.m. and Garewski spoke with Susan MacDonald at 3:34 p.m., before he spoke with the plaintiff despite Garewski's need to talk to the plaintiff first.  After meeting with Garewski, Brian logged on as a dispatcher, began working and took several calls.  While the plaintiff worked with MacDonald after meeting with Garewski, MacDonald did not notice the plaintiff acting disruptive or agitated and as he worked next to MacDonald he did not yell, glare or use profanity.

Lieutenant Lasata then summoned Brian to his office and asked Brian if he was doing alright and Brian responded that he was fine.  After meeting with Lasata, Brian went back to

work and took several more calls for approximately fifteen minutes.  While the plaintiff worked with MacDonald after meeting with Lasata, MacDonald did not notice the plaintiff acting disruptive or agitated and as he worked next to MacDonald he did not yell, glare or use profanity.

Brian was then summoned to Lt. Lasata's office again where Lt. Lasata, Captain Garewski and Sergeant Estes were present.  Garewski began asking the plaintiff the following questions:

(a)     Are you going to hurt yourself?  To which Brian said "No."

(b)     Are you going to hurt any anybody else or want to hurt anybody else?  To which Brian said "No."

(c)     Do you have any firearms in the building?  To which Brian said "No, that would be against orders.  But that's a valid question, given the whole Todd Smith case."

(d)     Are you going to be able to work tonight?  To which Brian said "Yes.  I have been working.  I didn't think job performance had been an issue."  To which Garewski responded: "No, job performance has never been an issue."

The plaintiff never said that he was going to commit suicide and he never said that he had a plan to commit suicide and he never said he didn't want to live any more.  No one told Estes that the plaintiff was suicidal or dangerous.

Garewski, Lasata and Estes did not offer Brian a referral to Pathways the Employee Assistance Program and mental health provider program during any of their interactions with him on April 17, 2002, they did not ask Brian if he was seeing a doctor, or how he was feeling

4

or if there was something wrong.  Neither Estes Garewski nor Lasata asked the plaintiff if he

was under psychiatric treatment during the conversation, which was another option to facilitate

the plaintiff's safety if Garewski, Lasata or Estes were concerned about the plaintiff's safety.

During the conversation with the plaintiff neither Garewski, Lasata nor Estes told Brian to calm

down or settle down or try to reduce Brian's alleged agitation.  Estes made a determination that

the plaintiff was suicidal and a harm to himself after a "quickie meeting" with Garewski, Lasata

and the plaintiff.  Garewski, Lasata and Estes were not concerned for the plaintiff's safety or the

safety of others because after meeting with the plaintiff, they let Brian leave  Lasata's office and

go back to work for 15-20 minutes.

     After Brian left, Garewski, Lasata and Estes decided to make an emergency committal.

During the conversation between Estes, Garewski and Lasata, where they decided to commit

Brian, Garewski explained that Brian had complained about the work environment in the ERC

earlier that day.  Garewski, Lasata and Estes falsely "diagnosed" the plaintiff as "paranoid".

Garewski has no training, experience or education in psychology or as a therapist.

     Brian first found out about that an ambulance had been called for him when the AMR

dispatcher called to advise that the ambulance was on scene and was requesting a CAD time to

log in that the ambulance had arrived at the West Hartford Police Department.  Estes went into

the bathroom with the plaintiff as the Lt. had ordered Estes to stay with Brian.  Brian asked Estes

if the evaluation was voluntary or not and Estes stated that it would be in his best interest if he

went on his own.  Once Estes told Brian that he was going to be committed Estes did not allow

him out of his sight and told Brian that he was not allowed to leave his sight.  Brian was taken

into custody by Estes and was not free to leave and Estes made the plaintiff feel that he was not free to leave and was forced into the ambulance and was taken to the Hospital. Brian cooperated with the EMTs and provided his medical information. In the ambulance Brian provided Estes with his home address, he also informed Estes that Heather was asleep at home because she had worked the midnight shift.

Lasata, Estes and Garewski took the plaintiff into custody and forced plaintiff into an ambulance to be taken to the University of Connecticut Health Center Emergency Room ("UCONN Health Center") for a Police Emergency psychiatric examination; unsuccessfully attempted to commit the plaintiff, pursuant to Connecticut General Statutes Section 17a-503; Defendants slandered and defamed plaintiff by publishing the false and defamatory statements that plaintiff was a "mental case" and that he was a danger to himself or others.

None of the defendants checked on Brian's status at the UConn Health center after he was placed in the ambulance, although two officers traveled with Iris Goldfarb to the hospital and drove her to her home after she was released. Brian was examined by medical doctors and psychiatrist at UCONN Health Center and thereafter immediately released.

No officers were ordered to accompany Brian to the hospital as they had done with Iris Goldfarb when she was also taken to the hospital that morning. When Goldfarb returned to the WHPD from the hospital two officers escorted her home, no one from the WHPD escorted the plaintiff home after he was released from the hospital. Defendants made no effort to determine the result of the above referenced psychiatric examination.

On April 17, 2002, Estes drafted a search and seizure warrant application to search for

6

weapons at Brian's home and his automobiles.  The search warrant application contained the false fabricated information described above and failed to disclose that plaintiff had been examined pursuant to Connecticut General Statutes Section 17a-503, and had been released immediately following the examination.  When the search and seizure warrant was presented to the Judge Rubinow, Estes did not inform the judge that the plaintiff had been released from the UConn Health Center after he had been examined and that the plaintiff did not pose any threat to himself or others.  Estes did not call Suffield police to notify them of the warrant, Estes called the Suffield police to have them standing by, but neither Estes nor any of the other defendants called the Suffield police to secure the Bartram home and make sure that the plaintiff did not gain access to the weapons while Estes spent two hours typing up the search warrant.

None of the defendants notified the Suffield Police Department that the plaintiff was a risk to himself or others and none of the defendants checked whether with the UCONN Health Center whether the plaintiff had been released.  Estes knew that the plaintiff could be immediately released after the hospital examined him but did not check whether the plaintiff had been released prior to presenting the search and seizure warrant to the Judge.  Estes's conduct during the execution of the search warrant was "questionable" as he was adversarial and told Heather about "Brian blowing his brains out."

Brian was cleared by the psychiatrist at the Hospital at 9:30 p.m., prior to the signing of the warrant by the Judge and prior to the execution of the Search Warrant.  Brian was cleared to return to work by Dr. Phillip Mays on May 7, 2002, and returned to work as a dispatcher on

May 9, 2002.  Rosensweig indicates in his own notes, that his concern when the plaintiff

returned to work was whether the plaintiff  "can get along with other employees."

The defendants violated their policies and procedures as well as state and federal law

when they made the emergency committal.  The West Hartford Police Department has specific

procedures when dealing with an emotionally disturbed person, which has an effective date of

March 13, 2000.  When the ambulance was called for the plaintiff, at the direction of Lasata,

the call was for an emotionally disturbed person, pursuant to Section 10.33, a "mental case"

call.

The PRD Section 10.33 provide the following directives: "When contact is made with a

person who is suicidal or apparently mentally ill who appears to be a danger to himself/herself

or others they will immediately be sent by ambulance to a local hospital under an emergency

committal.  The only exception to this is if an attending physician wishes the patient to be sent

to a specific facility."  Neither Estes, Lasata or Garewski asked the plaintiff if he was treating

with a physician and they did not consult with any attending physician prior to forcing the

plaintiff into an emergency committal, in violation of PRD Section 10.33.

The PRD Section 10.33 provide the following directives: "When contact is made with a

person who is suicidal or apparently mentally ill who appears to need immediate help, but does

not appear to be a clear danger to himself or others and is receiving treatment, every effort

must be made to reach the counselor/doctor.  If the person is not under treatment, or you are

unable to reach the counselor/doctor the Mobile Crisis Team (MCT) will be called."  Neither

Estes, Lasata or Garewski asked the plaintiff if he was treating with a physician and they did

not consult with any attending physician prior to forcing the plaintiff into an emergency committal, in violation of PRD Section 10.33.  Further, the MCT was not called, an ambulance was called and the plaintiff was forced into the ambulance by Estes at Garewski and Lasata's direction and with Chief Strillacci's knowledge.

The PRD Section 10.33 provide the following directives: "Under no circumstances shall a mentally disturbed person be left alone or allowed to operate a motor vehicle, if the person is a danger to himself or others."  After meeting with Garewski, Lasata and Estes, the plaintiff was allowed to work as a dispatcher between each meeting, and was allowed to his vehicle: "Lt. Lasata told Captain Garewski that the plaintiff had gone out-to his car and agreed to let Captain Garewski know when the plaintiff returned."  Garewski, Lasata and Estes also let the plaintiff leave and go back to work for 15-20 minutes alone.

## III. LEGAL ARGUMENT

### A. STANDARD OF REVIEW

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure should be granted only when the "pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Before a court can rule on a motion for summary judgment, the moving party must satisfy its burden of production, by either "putting evidence into the record which affirmatively disproves an element of the non-moving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim".  Celotex Corp. v.

<u>Catrett</u>, 477 U.S. 317, 323-25 (1986).  Once the moving party has met its burden of production, the non-moving must provide specific facts showing a genuine issue for trial.  <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d Cir. 1992).  The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide."  <u>Id.</u> Thus "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir.) <u>cert. denied</u>, 502 U.S. 849 (1991).  Moreover, not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them.  <u>Diamontopulos v. Brookside Corp.</u>, 683 F.Supp. 322, 325 (D.Conn. 1988), citing <u>Donohue v. Windsor Locks Board of Fire Commissioners</u>, 834 F.2d 54, 57-58 (2d Cir. 1987).

**B.    SUMMARY JUDGMENT STANDARD UNDER § 1983.**

To state a cause of action under §§ 1983, the plaintiff must show (1) that the defendants deprived him of a right "secured by the Constitution or laws of the United States"; and (2) that they did so "under color of state law."  <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999); accord <u>Snider v. Dylag</u>, 188 F.3d 51, 53 (2d Cir. 1999); <u>Dwares v. City of New York</u>, 985 F.2d 94, 98 (2d Cir. 1993).  The elements of a plaintiff's case are the same under Section 1981, Section 1983, or Title VII. Direct evidence is not necessary to prove employer acted with discriminatory motive.  <u>Randle v. City of Aurora</u>, 69 F.3d 441 (10th Cir. 1995).  A

showing of pretext is evidence which allows a jury to infer discriminatory intent.  Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995).  Because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the summary judgment state is sufficient to get the case to the jury.  Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995).  Procedural irregularities can provide sufficient evidence of pretext to defeat summary judgment where the disregarded procedures directly and uniquely disadvantage a minority employee, ...”  Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995).

　　　　　Due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually inappropriate for summary judgment.  Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis., 991 F.2d 1249 (7th Cir. 1993).  Evidence of mixed motives is “ordinarily not the gist for the summary judgment mill,” and, where there was evidence that defendants were racists, ...” Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis., 991 F.2d 1249 (7th Cir. 1993).  Trier of fact may consider the same evidence introduced to prove prima facie case in determining whether discipline was pretextual.  Lowe v. City of Monrovia, 775 F.2d 998 (9th Cir. 1985) Decision as to employer’s motive is almost always for the trier of fact to determine at trial.  Lowe v. City of Monrovia, 775 F.2d 998 (9th Cir. 1985).

　　　　Plaintiff may defeat summary judgment in a discrimination or retaliation case if he or she can present evidence that the proffered reason for the adverse action was pretextual or “unworthy of belief” or if he or she can otherwise introduce evidence of illegal motive.  Beaird v. Seagate Technology, Inc., 145 F.3d 1159 (10th Cir. 1998).  To survive summary judgment, a plaintiff will prevail “by either a) discrediting the employer’s proffered reasons, either circumstantially or

11

directly or b) by adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determining cause of the adverse employment action." Torres v. Casio Inc., 42 F.3d 825 (3rd Cir. 1994).

> **C.      THE PLAINTIFF HAS ESTABLISHED HIS FOURTH AMENDMENT –
> FALSE ARREST CLAIM AND FOURTEENTH AMENDMENT DUE
> PROCESS CLAIM AS THE DEFENDANTS DID NOT HAVE
> PROBABLE CAUSE TO INVOLUNTARILY HOSPITALIZE THE
> PLAINTIFF AND THE DEFENDANTS DID NOT MAKE A FINDING OF
> DANGEROUSNESS.**

The defendants argue that the plaintiff's Fourth Amendment claim fails because the defendants had probable cause to seize him and involuntarily hospitalize him.  There are material facts in dispute as to the pertinent events and the knowledge of the defendants which led to the arrest of the plaintiff, and the court can not make a determination that the defendants' seizure of the plaintiff was reasonable.

It is well established that  "[a] § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest."  Kent v. Katz, 312 F.3d 568, 573 (2d Cir. 2002); Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996);  Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").  Thus, a finding of probable cause is a complete defense to an action for false arrest. See, e. g., Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).

"In determining whether police officers had probable cause to make an arrest, courts examine the 'totality of the circumstances'"  Bernard, 25 F.3d at 102 (quoting Illinois v. Gates, 462 U.S. 213, 230, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1982)).  "Probable cause is established

when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  Singer, 63 F.3d at 119 (internal quotation marks omitted).  If there are no material facts in dispute "as to the pertinent events and the knowledge of the officers," the question of probable cause may be determined as a matter of law. Weyant, 101 F.3d at 852; see also Singer, 63 F.3d at 118-19.

"Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section." Conn. Gen. Stats. § 17a-503a. "According to the Second Circuit, the Fourth Amendment 'requires that an involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'"  Walsh v. Sousa, 2004 U.S. Dist. LEXIS 5529, 14-16 (D. Conn., 2004), quoting Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993).

Pursuant to the Fourteenth Amendment, a "finding of dangerousness is required before a person may be constitutionally deprived of [his] liberty interest." Rzayeva v. Foster 134 F. Supp.2d 239, 248 (D. Conn. 2001).

The police defendants, Estes, Garewski, Lasata, and Strillacci did not have "reasonable grounds" to believe that the plaintiff had psychiatric disabilities and was "dangerous to himself or herself or others or gravely disabled" and was "in need of immediate care and treatment.

13

Material facts in dispute exist as to whether the defendants believed that the plaintiff was a danger to himself as demonstrated by the fact that the defendants did not follow their own procedures. There are specific procedures and guidelines for dealing with an emotionally disturbed person, which was in effect on March 13, 2000, which are set forth in PRD Section 10.33, Exhibit 9. None of the defendants followed these guidelines and acted in complete contravention of the guidelines. The reason that Estes, Garewski and Lasata did not follow these guidelines and did not treat the plaintiff as an emotionally disturbed person is because they did not think he was an emotionally disturbed person. See Plaintiff Material Facts in Dispute ¶¶ 69-73.

The PRD Section 10.33 provide the following directives: "When contact is made with a person who is suicidal or apparently mentally ill who appears to be a danger to himself/herself or others they will immediately be sent by ambulance to a local hospital under an emergency committal. The only exception to this is if an attending physician wishes the patient to be sent to a specific facility." Neither Estes, Lasata or Garewski asked the plaintiff if he was treating with a physician and they did not consult with any attending physician prior to forcing the plaintiff into an emergency committal, in violation of PRD Section 10.33. Id.

The PRD Section 10.33 provide the following directives: "When contact is made with a person who is suicidal or apparently mentally ill who appears to need immediate help, but does not appear to be a clear danger to himself or others and is receiving treatment, every effort must be made to reach the counselor/doctor. If the person is not under treatment, or you are unable to reach the counselor/doctor the Mobile Crisis Team (MCT) will be called." Neither Estes, Lasata

14

or Garewski asked the plaintiff if he was treating with a physician and they did not consult with any attending physician prior to forcing the plaintiff into an emergency committal, in violation of PRD Section 10.33.  Further, the MCT was not called, an ambulance was called and the plaintiff was forced into the ambulance by Estes at Garewski and Lasata's direction and with Chief Strillacci's knowledge. Id.

The PRD Section 10.33 provide the following directives: "Under no circumstances shall a mentally disturbed person be left alone or allowed to operate a motor vehicle, if the person is a danger to himself or others."  After meeting with Garewski, Lasata and Estes, the plaintiff was allowed to work as a dispatcher between each meeting, and was allowed to his vehicle: "Lt. Lasata told Captain Garewski that the plaintiff had gone out-to his car and agreed to let Captain Garewski know when the plaintiff returned."  Garewski, Lasata and Estes also let the plaintiff leave and go back to work for 15-20 minutes alone. Id.

Further, material facts in dispute exist as to the defendants actual concern that the plaintiff was going to injure himself because after each meeting with the plaintiff, where he allegedly acted agitated and "invoked the name of Todd Smith", the defendants allowed the plaintiff to return to work for upwards of twenty minutes.  During the three separate times that the plaintiff returned to work as an emergency dispatcher, he sometimes worked alone and sometimes he worked with Sue MacDonald.  The plaintiff had already complained to Garewski about working with MacDonald and how it was causing conflicts and communication problems, but Garewski allowed the plaintiff, who Garewski allegedly thought was suicidal and a danger to himself, to return to work with MacDonald.  Further, during those times that MacDonald and the

15

plaintiff worked together on April 17, 2002, MacDonald did not observe the plaintiff acting disruptive or agitated and as he worked next to MacDonald he did not yell, glare or use profanity.  See Plaintiff Material Facts in Dispute ¶¶ 22,25,35.

The facts of April 17, 2002, as set forth by the defendants, rely heavily upon a document created by Garewski (hereinafter  "Notes".  There are many credibility issues surrounding the creation and use of this document as a revisionist historical account of the day's events.  First, the Notes were not contemporaneously made See Plaintiff Material Facts in Dispute ¶12. Garewski testified that he took contemporaneous handwritten notes of the conversations he had with the ERC staff but he typed the handwritten notes into the computer at a later time and the computer notes were not done contemporaneously.  See Plaintiff Material Facts in Dispute ¶15. Garewski created the Notes but has never kept any notes for any other event that has taken place at the WHPD or on any other employee of the WHPD.  See Plaintiff Material Facts in Dispute ¶13. There are questions as to where the document was saved and when Garewski had last reviewed the document.  See Plaintiff Material Facts in Dispute ¶14.  There was no purpose for Garewski to create and maintain his notes except for the purposes of litigation as the Emergency Committal Form and the police reports were used officially to record the incidents of April 17, 2002.  See Plaintiff Material Facts in Dispute ¶18.

Sonia Vigue does not recall speaking with Garewski on April 27, 2002 as indicated in his notes.  Carol Thibideau does not recall speaking with Garewski after April 17, 2002, as indicated in Garewski's notes.  See Plaintiff Material Facts in Dispute ¶19.

The credibility of the Notes and the facts that are outlined in his notes, which were

copied into his affidavit and used verbatim in his deposition, is questionable, as the motivation behind the creation of the Notes was clearly to outline and document, after the fact, that he had probable cause to commit the plaintiff.

Issues of fact exist as to what Heather, the plaintiff's wife, expressed to Garewski on the morning of April 17, 2002. Heather had not come to Garewski regarding problems with the plaintiff but with problems in the ERC. Plaintiff's Denial to Defendant 56(a) ¶13.

Issues of fact exist as to when Sonia Vigue told Garewski that the plaintiff was "agitated, red faced and yelling" and whether the plaintiff ever yelled, was red faced or agitated in the ERC when he arrived to work. Plaintiff's Denial to Defendant 56(a) ¶¶17, 18, 19. Vigue was not concerned about the plaintiff and whether he was a risk to himself or others because she did not tell anyone immediately that he was a risk, she did not try keep him calm and she did not keep him with her to talk as she had been trained to do in situations where there was a person who was suicidal or posed a risk to himself or others. When he arrived to work, his main focus was delivering flowers to Sharon Williams and Iris Goldfarb, hardly an act that indicates that the plaintiff was angry or suicidal.

Issues of fact exist as to what occurred during the first meeting between Garewski and the plaintiff. Plaintiff's Denial to Defendant 56(a) ¶¶20, 21, 22, 23; See Plaintiff Material Facts in Dispute ¶¶20, 21, 22, 23. When Garewski called the plaintiff to his office, the plaintiff told Garewski about the problems in the ERC including the lack of communication between the dispatchers and complained that the atmosphere jeopardized public safety. Garewski told Brian that the conflicts in the ERC was not the department's concern and that the plaintiff was the

17

only dispatcher who was not cooperating with him and told Brian that he could excuse himself from the meeting.  Id.  During Brian's meeting with Garewski, Brian did not yell or use profanity toward Garewski during the meeting.  Id.

After meeting with Garewski, Garewski sent the plaintiff back to work with MacDonald. While the plaintiff worked with MacDonald after meeting with Garewski, MacDonald did not notice the plaintiff acting disruptive or agitated and as he worked next to MacDonald he did not yell, glare or use profanity.  Plaintiff's Denial to Defendant 56(a) ¶26.

The plaintiff then met with Lt. Lasata who questioned whether the plaintiff felt fine and the plaintiff said he was fine.  Issues of fact exist as to when occurred during the meeting with Lasata, Garewski and Estes.  The plaintiff was then summoned to Lt. Lasata's office again where Lt. Lasata, Captain Garewski and Sergeant Estes were present and Garewski asked the plaintiff the following questions: (a)    Are you going to hurt yourself? To which Brian said "No." Bartram Deposition, at 169. (b) Are you going to hurt any anybody else or want to hurt anybody else? To which Brian said "No." Bartram Deposition, at 169. (c)    Do you have any firearms in the building? To which Brian said "No, that would be against orders.  But that's a valid question, given the whole Todd Smith case." Bartram Deposition, at 171.  (d)        Are you going to be able to work tonight? To which Brian said "Yes.  I have been working.  I didn't think job performance had been an issue."  To which Garewski responded: "No, job performance has never been an issue." Bartram Deposition, at 172.  The plaintiff never said "I have firearms at home, and you remember what happened to Todd Smith." See Plaintiff Material Facts in Dispute ¶26.

While there is a dispute about the actual words that the plaintiff said regarding Todd Smith, there is no dispute about the actions of Garewski, Lasata and Estes, immediately after the plaintiff made the alleged Todd Smith comment.  Garewski, Lasata and Estes were not concerned about the plaintiff as none of them offered the plaintiff a referral to Pathways the Employee Assistance Program and mental health provider program during any of their interactions with him on April 17, 2002, they did not ask the plaintiff if he was seeing a doctor, or how he was feeling or if there was something wrong, they did not try to calm down or try to reduce the plaintiff's alleged agitation and they did not ask the plaintiff if he was under psychiatric treatment or had a therapist.  Further, Garewski, Lasata and Estes were not concerned for the plaintiff's safety or the safety of others because after meeting with the plaintiff, they let the plaintiff leave  Lasata's office and go back to work unsupervised for 15-20 minutes and take 911 Emergency calls, with Susan MacDonald.

The defendants conduct while the events of April 17, 2002 unfolded demonstrate that they were not concerned that the plaintiff was going to harm himself.  They were sensitive to the lawsuit that had been brought against the Town by the Estate of Todd Smith, an officer who had shot himself, and the defendants decided to make an example of the plaintiff in reaction to the Todd Smith lawsuit and because the plaintiff had complained about the ERC work environment.

The defendants did not have probable cause to involuntarily hospitalize the plaintiff.  Their actions were not reasonable.  If the defendants thought that there was a probability or substantial chance of dangerous behavior they would have never allowed him to work as a 911 Emergency dispatcher.  They never would have left him unsupervised three times for up to

19

twenty minutes each time. They never would have let him work side by side the alleged cause of his alleged suicidal thoughts-Sue MacDonald. They would never have allowed the plaintiff to go to his car, unsupervised. The defendants did not invoke or follow the guidelines for dealing with an emotionally disturbed person, had they thought he was emotionally disturbed they would have followed those guidelines which include: "Under no circumstances shall a mentally disturbed person be left alone or allowed to operate a motor vehicle, if the person is a danger to himself or others." See Plaintiff Material Facts in Dispute ¶73.

Sergeant Estes, the requesting officer for the emergency committal, based his decision that the plaintiff was suicidal and a harm to himself after a "quickie meeting" with Garewski, Lasata and the plaintiff. Estes Deposition, at 251.

Prior to forcing the plaintiff to undergo a psychiatric evaluation pursuant to General Statutes §17a-503, the defendants did not think that the plaintiff was a danger to himself. The defendants did not have probable cause to involuntarily hospitalize the plaintiff as required by the Fourth Amendment and the defendants did not make a finding of dangerousness as required by the Fourteenth Amend Due Process Rights. Therefore, the defendants Motion for Summary Judgment should be denied.

    **D.    THE DEFENDANTS DID NOT HAVE PROBABLE CAUSE TO APPLY FOR THE SEARCH AND SEIZURE WARRANT OF THE PLAINTIFF'S HOUSE AND CARS.**

To prevail on a claim of Fourth Amendment violation for the search of the plaintiff's home and cars, the plaintiff must make the same showing that is required at a suppression hearing under Franks v. Delaware, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667

(1978): the plaintiff must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause. Bourguignon v. Guinta, 247 F. Supp. 2d 189, 193 (D. Conn., 2003); Golino v. City of New Haven, 950 F.2d [864,] 870-71 [(2d Cir. 1991), cert. denied, 505 U.S. 1221, 120 L. Ed. 2d 902, 112 S. Ct. 3032 (1992)]; Franks, 438 U.S. at 171-72, 98 S. Ct. 2674.

Whether an item of information is material or not is, in the context of a motion for summary judgment, a mixed question of law and fact. See, e.g., TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The factual component requires an inference as to whether the information would likely be given weight by a person considering that question. TSC Industries, Inc. v. Northway, Inc., 426 U.S. at 450, 96 S.Ct. at 2132. "The weight that a neutral magistrate would likely have given the above information, along with the other information that was concealed or misrepresented, is not a legal question but rather is a question to be resolved by the finder of fact." Golino v. City of New Haven, 950 F.2d 864 (2d Cir. 1991).

On April 17, 2002, the Estes caused to be drafted a search and seizure warrant application to search for weapons at plaintiff's home and his automobiles. Search and Seizure Warrant, Exhibit 21. The search warrant application contained the false fabricated information described above and failed to disclose that plaintiff had been examined pursuant to Connecticut

21

General Statutes Section 17a-503, and had been released immediately following the examination. Id.

When the search and seizure warrant was presented to the Judge Rubinow, Estes did not inform the judge that the plaintiff had been released from the UConn Health Center after he had been examined and that the plaintiff did not pose any threat to himself or others. Deposition of Estes, at 154-156. Estes did not call Suffield police to notify them of the warrant, Estes called the Suffield police to have them standing by, but neither Estes or any of the other defendants called the Suffield police to secure the Bartram home and make sure that the plaintiff did not gain access to the weapons while Estes spent two hours typing up the search warrant. Deposition of Estes, at 147-148.

Estes made material misrepresentations that included that the plaintiff was cleared by the Hospital and found by a psychiatric physician not to be a danger to himself at 9:30 p.m. Estes did not attempt to find this information out or communicate such information to the Judge, thus making a false misrepresentation to the Judge that the plaintiff to himself. Therefore, the plaintiff's Fourth Amendment claim is valid and the defendants' Motion should be denied.

E. **THE PLAINTIFF HAS ESTABLISHED HIS FOURTEENTH AMENDMENT CLAIM.**

The plaintiff alleges a violation of his Substantive Due Process  Fourteenth Amendment rights. A claim for a substantive due process violation must "shock the conscience." Rochin v. California, 342 U.S. 165, 172 (1952). "[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument

of oppression.'" De Shaney v. Winnebago County Dept. of Social Services, 489 U.S.189, 196

(1989) quoting Davidson v. Cannon, 474 U.S. 344, 348 (1986. Actions violate the substantive

component of the Due Process Clause only when they "can properly be characterized as

arbitrary, or conscience shocking, in a constitutional sense." Collins v. Harker Heights, 503 U.S.

115, 128 (1992); see also County of Sacremento v. Lewis, 523 U.S. 833 (1998). Actions

intended to injure in some way and unjustifiable by any government interest will most likely be

found conscience-shocking. Id. This is a fact-specific inquiry that requires a case by case

analysis.

    Understanding that actions which would shock the conscience in one set of circumstances

could be considered completely rational in another set of circumstances, the Supreme Court has

established that the "deliberate indifference" standard will determine if an official's actions

"shock the conscience." Sacremento v. Lewis, 523 U.S. at 850-1; see also Betts v. Brady, 316

U.S. 455, 462 (1942). Inherent to the word "deliberate" is the idea that the actor must

contemplate her actions within a given time frame, pre-meditated actions are decidedly more

egregious and therefore often rise to the level of constitutional violation. Id.

    The Supreme Court has held, and the Second Circuit has recognized, the subjective

deliberate indifference standard to determine if an official's actions shock the conscience. This

standard necessitates that the official actually knew of the substantial risks of his behavior and

violated the individual's rights by responding with deliberate indifference. See Farmer v.

Brennan, 511 U.S. 825, 837 (1994); Hanrahan v. City of Norwich, 959 F.Supp. 118, 122 (D.

Conn. 1997). A government official shocks the conscience and violates one's substantive due

process rights when, given the opportunity to deliberate and decide upon a course of action that would intentionally harm an individual, that official carries through with such actions.  <u>Daniels</u> <u>v. Williams</u>, 474 U.S. 327,331, 106 S.Ct. 662 (1986).  The actions of the defendants meet the criteria of subjective deliberate indifference.

  The defendants conduct while the events of April 17, 2002 unfolded demonstrate that they were not concerned that the plaintiff was going to harm himself.  They were sensitive to the lawsuit that had been brought against the Town by the Estate of Todd Smith, an officer who had shot himself, and the defendants decided to make an example of the plaintiff in reaction to the Todd Smith lawsuit and because the plaintiff had complained about the ERC work environment. The actions of the defendants were and are extreme and outrageous, shocking to the sensibilities of any reasonable person and will continue unabated unless strictly prohibited by the court. The facts in this case demonstrate that the defendants deliberately decided upon a course of action that would intentionally harm the plaintiff.  Therefore, the plaintiff's Substantive Due Process Claim is valid.

**F. CLAIMS AGAINST ROSENSWEIG.**

  Rosenswieg was involved in forcing the plaintiff to submit a fitness for duty letter based upon false allegations that he was suicidal.  Rosenswieg's actions accepted and adopted the false claims of the plaintiff's suicidal behavior.  Additionally, as part of the chain of command, Rosenswieg was aware of the events of April 17, 2002 and did not attempt to stop Estes, Lasata and Garewski's conduct.  Rosenswieg was involved in the events of April 17, 2002 and the following events that affected the plaintiff.  Therefore, the defendants' Motion should be

denied.

### G.    CLAIMS AGAINST STRILLACCI

Chief Strillacci was made aware of that the plaintiff was to be involuntarily committed and that his home  was to be searched.  Chief Strillacci approved of the emergency committal and of the application of the search warrant although he had worked with the plaintiff and did not verify the allegations that Estes, Garewski and Lasata were making against the plaintiff.  The defendants conduct while the events of April 17, 2002 unfolded demonstrate that they were not concerned that the plaintiff was going to harm himself.  They were sensitive to the lawsuit that had been brought against the Town by the Estate of Todd Smith, an officer who had shot himself, and the defendants decided to make an example of the plaintiff in reaction to the Todd Smith lawsuit and because the plaintiff had complained about the ERC work environment.  Chief Strillacci did not attempt to stop Estes, Lasata and Garewski's conduct and approved of it.  Therefore, the defendants' Motion should be denied.

### H.    THE PLAINTIFF HAS SUFFICIENTLY'S FIRST AMENDMENT CLAIMS

The Plaintiff was retaliated against in violation of his First Amendment.  To prevail on a First Amendment retaliation claim the plaintiff  must establish: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98 (2nd Cir. 2001); see also Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001).   Those elements have been established by the Plaintiff.

The plaintiff complained to Garewski about the communication problems in the ERC.

Garewski made the plaintiff the target.  He did not address the source of the conflicts, the affair

between Hungerford and MacDonald.  See Plaintiff Material Facts in Dispute ¶¶ 37-44.  The

supervisors and the ERC had a history of conflicts where supervisors would turn their backs to

the problem and ignore the conflict.  Id.  He did not provide Hungerford with any counseling or a

referral to the mental health provider although Hungerford was having an extramarital affair with

a  co-worker.  It is a high pressure environment in the ERC and communication and cooperation

is very important between the police department and the ERC and if people are not

communicating with one another it could be a danger to the public or to officers.  Id.

Immediately after the plaintiff made the complaints to Garewski, which were matters of public

concern, the plaintiff became the target for Garewski, Lasata and Estes.

     As discussed above, the defendants did not have probable cause to commit the plaintiff,

and the plaintiff has established that he was retaliated against for his speech on a public matter.

Therefore, the defendants' Motion should be denied.

## I.   THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

     The doctrine of qualified immunity provides that: "government officials performing

discretionary function, generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." Moffit v. Brookfield, 950 F. 2d 880, 885 (2d Cir. 1991).

     "The relevant inquiry is whether it would be clear to a reasonable officer that his conduct

was unlawful in the situation he confronted.  Thus, as the Supreme Court has pointed out,

qualified immunity protects all but the plainly incompetent or those who knowingly violate the

law." (Emphasis added; internal quotations and citations omitted) <u>Stephenson v. Doe</u>, 332 F.3d 68, 77-78 (2d Cir. 2003).

    "A courts evaluation of a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999).  If the court finds that a clearly established right of the plaintiff has been violated, the court must then determine whether the defendant's actions "could reasonably have been thought consistent with the rights they are alleged to have violated." <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987).  The Supreme Court has held that "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 527-28 (1985).  Qualified Immunity is an affirmative defense, and as such the burden is on defendant to establish its existence.  <u>See In re: State Police</u>, 88 F.3d 111, 123

    "The matter of whether a right was clearly established at the pertinent time is a question of law.  See, e.g., <u>Crawford-El v. Britton</u>, 523 U.S. 574, 589, 140 L. Ed. 2d 759, 118 S. Ct. 1584 (1998); <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 528, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985); <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818; <u>X-Men Security, Inc. v. Pataki</u>, 196 F.3d 56, 66 (2d Cir. 1999); <u>Genas v. State of New York Department of Correctional Services</u>, 75 F.3d 825, 830 (2d Cir. 1996).  In contrast, the matter of whether a defendant official's conduct was objectively reasonable, i.e., whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact.  See, e.g., <u>Lennon v.</u>

Miller, 66 F.3d 416, 422 (2d Cir. 1995); Oliveira v. Mayer, 23 F.3d at 649-50. A contention that--notwithstanding a clear delineation of the rights and duties of the respective parties at the time of the acts complained of--it was objectively reasonable for the official to believe that his acts did not violate those rights "has its principal focus on the particular facts of the case." Hurlman v. Rice, 927 F.2d 74, 78-79 (2d Cir. 1991); see, e.g., Oliveira v. Mayer, 23 F.3d at 649-50. Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, see, e.g., Lennon v. Miller, 66 F.3d at 421; Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993); Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987), if there is such a dispute, the factual questions [*40] must be resolved by the fact finder, see, e.g., Kerman II, 261 F.3d at 241; Oliveira v. Mayer, 23 F.3d at 649; Calamia v. City of New York, 879 F.2d 1025, 1036 (2d Cir. 1989). "Though 'immunity ordinarily should be decided by the court, '. . . that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required . . . ." Oliveira v. Mayer, 23 F.3d at 649 (quoting Hunter v. Bryant, 502 U.S. 224, 228, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991)).  After receiving "the jury['s] . . . decision as to 'what the facts were that the officer faced or perceived,'" the court then may "make the ultimate legal determination of whether qualified immunity attaches on those facts." Stephenson v. Doe, 332 F.3d 68, 81 (2d Cir. 2003) (emphases added); see, e.g., Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir.) ("If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues on special interrogatories.  The ultimate legal determination  whether . . . a reasonable police officer should have known he acted unlawfully"

28

should be made by the court "on the facts found" by the jury. (emphasis added)), cert. denied, 498 U.S. 967, 112 L. Ed. 2d 414 (1990). <u>Kerman v. City of New York</u> , 2004 U.S. App. LEXIS 13322, 38-41 (2d Cir., 2004).

The defendants' actions were not reasonable.  The actions of Garewski, Lasata and Estes, immediately after the plaintiff made the alleged Todd Smith comment demonstrate that they were not reasonable and that they did not think that the plaintiff was a danger to himself but they falsely arrested him.  Garewski, Lasata and Estes were not concerned about the plaintiff as none of them offered the plaintiff a referral to Pathways the Employee Assistance Program and mental health provider program during any of their interactions with him on April 17, 2002, they did not ask the plaintiff if he was seeing a doctor, or how he was feeling or if there was something wrong, they did not try to calm down or try to reduce the plaintiff's alleged agitation and they did not ask the plaintiff if he was under psychiatric treatment or had a therapist.   Further, Garewski, Lasata and Estes were not concerned for the plaintiff's safety or the safety of others because after meeting with the plaintiff, they let the plaintiff leave  Lasata's office and go back to work unsupervised for 15-20 minutes and take <u>911 Emergency calls</u>, with Susan MacDonald.

The defendants conduct while the events of April 17, 2002 unfolded demonstrate that they were not concerned that the plaintiff was going to harm himself.  They were sensitive to the lawsuit that had been brought against the Town by the Estate of Todd Smith, an officer who had shot himself, and the defendants decided to make an example of the plaintiff in reaction to the Todd Smith lawsuit and because the plaintiff had complained about the ERC work environment.

The defendants did not have probable cause to involuntarily hospitalize the plaintiff.

29

Their actions were not reasonable.  If the defendants thought that there was a probability or substantial chance of dangerous behavior they would have never allowed him to work as a 911 Emergency dispatcher.  They never would have left him unsupervised three times for up to twenty minutes each time.  They never would have let him work side by side the alleged cause of his alleged suicidal thoughts-Sue MacDonald.  They would never have allowed the plaintiff to go to his car, unsupervised.  The defendants did not invoke or follow the guidelines for dealing with an emotionally disturbed person, had they thought he was emotionally disturbed they would have followed those guidelines which include: "Under no circumstances shall a mentally disturbed person be left alone or allowed to operate a motor vehicle, if the person is a danger to himself or others." See Plaintiff Material Facts in Dispute ¶73.

The defendants knew that they acted unlawfully, that is the reason Garewski created his Notes, in order to protect themselves from future litigation.  The defendants' actions are demonstrative of their unlawful conduct and their knowledge that the conduct was unlawful. Therefore, the defendants are not entitled to qualified immunity and their Motion should be denied.


**J.**     **THE PLAINTIFF HAS ESTABLISHED A CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

To prevail on his claim for intentional infliction of emotional distress the plaintiff must prove the following:  (1) that defendant intended or should have known that emotional distress was a likely result of  their conduct; (2) that the conduct was extreme and outrageous (3) that the conducted caused plaintiff distress (4) and that the plaintiff suffered severe emotional distress.

30

Drew v. K-Mart Corp., 37 Conn App. 239, 251 (1995).  To sustain a claim for intentional

infliction of emotional distress, the plaintiff must show that the defendant in "conduct exceeding

all bounds usually tolerated by decent society." DeLaurentis v. City of New Haven, 220 Conn.

225, 597 A.2d 807, 828 (1991).

In order to maintain a claim for Intentional Infliction of Emotional Distress, a complaint

must provide instances of  "conduct exceeding all bounds usually tolerated by decent society, of

a nature which is especially calculated to cause, and does cause, mental distress of a very serious

kind." Brown v. Town of East Haddam, 213 F.3d 625 (2d. Cir. 2000).

The defendants' conduct demonstrates that their actions were extreme and outrageous,

shocking to the sensibilities of any reasonable person.  Garewski, Lasata and Estes: "maliciously

and falsely stated to others and stated in official documents that the plaintiff: (1) had made

affirmative responses to the above questions: (2) stated that it would be easy to do harm to

himself or others; and (3) had referred to deceased West Hartford Officer Todd Smith's

suicide";"falsely and maliciously fabricated this and other statements in order to perpetuate a

course of illegal conduct against the plaintiff, as more particularly described below"; "falsely

"diagnosed" the plaintiff as "paranoid" and took the plaintiff into custody and forced plaintiff into

an ambulance to be taken to the University of Connecticut Health Center Emergency Room

("UCONN Health Center") for a Police Emergency psychiatric examination";  "attempted to

commit the plaintiff, pursuant to Connecticut General Statutes Section 17a-503.

The  Defendants slandered and defamed plaintiff by publishing the false and defamatory

statements that plaintiff was a "mental case" and that he was a danger to himself or others";; "Plaintiff was publicly humiliated and was presented in a false light as a dangerous mental or psychiatrically disturbed person; "On April 18, 2002, the defendants caused to be drafted a search and seizure warrant application to search for weapons at plaintiff's home and his automobiles"; and "The search warrant application contained the false fabricated information described above and failed to disclose that plaintiff had been examined pursuant to Connecticut General Statutes Section 17a-503, and had been released immediately following the examination".

Therefore, the defendants' motion should be denied.

## K.    THE PLAINTIFF HAS SUFFICIENTLY'S PLEAD A CAUSE OF ACTION OF FALSE IMPRISONMENT.

"False imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." Green v. Donroe, 186 Conn. 265, 267, 440 A.2d 973 (1982). "The applicable law for these two causes of action is identical." Outlaw v. City of Meriden, 43 Conn.App. 387, 392, 682 A.2d 1112, cert. denied, 239 Conn. 946, 686 A.2d 122 (1996). A person is liable for false imprisonment if "his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." (Internal quotation marks omitted.) Rivera v. Double A Transportation, 248 Conn. 21, 32  727 A.2d 203 (1999).  To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly.  Id.

The plaintiff was in custody and his liberty was restrained.  The plaintiff asked if the psychiatric evaluation was voluntary or not and Estes stated that it would be in his best interest if he went on his own.  Once Estes told the plaintiff that he was going to be committed Estes did not allow the plaintiff out of his sight and told the plaintiff that he was not allowed to leave his sight.  Estes Deposition, at 76.  The plaintiff was taken into custody by Estes and was not free to leave and Estes made the plaintiff feel that he was not free to leave.  Estes Deposition, at 127-128.  The plaintiff's physical liberty was restrained by Estes and the committal was not voluntary.  Therefore, the defendants' Motion for Summary Judgment should be denied.

.

## CONCLUSION

Material facts in dispute exist as to the pertinent events of April 17, 2002 and the knowledge of the defendants which led to the emergency committal of the plaintiff and the unreasonable search of his home.  Therefore, the defendants' Motion for Summary Judgment as to all of the plaintiff's claims should be denied.

BY:_____

James S. Brewer

Brewer & O'Neil, LLC

818 Farmington Avenue

West Hartford, CT 06119

33

Federal Bar #ct 07019

Tel.:  (860)523-4055

Fax: (860) 233-4215

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed via U.S. Mail, postage pre-paid on August 6, 2004, to the following:


    Scott M. Karsten, Esq.
    Marcia J. Gleeson
    Nicole D. Dorman
    Sack Spector & Karsten
    836 Farmington Avenue
    West Hartford, CT 06119


_____
James S. Brewer