UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRIAN BARTRAM, | : | NO.:3:02cv2148(SRU) |
| Plaintiff, | : | |
| TOWN OF WEST HARTFORD, CARL | : | |
| ROSENSWEIG, J.A. GAREWSKI, | : | |
| JOSEPH LASATA and STEPHEN B. | : | |
| ESTES, | : | AUGUST 6, 2004 |
| Defendants. | | |

**LOCAL RULE 56(a) STATEMENT**

1.      At all relevant times, plaintiff Brian D. Bartram was a duly appointed Public Safety Dispatcher with the Town of West Hartford Police Department.  Second Amended Complaint, ¶ 5.

**Admit.**

2.      At all relevant times, defendant James Strillacci was the Chief of Police of the West Hartford Police Department.  Second Amended Complaint, ¶ 2.

**Admit.**

3.      At all relevant times, defendant Carl Rosensweig was an Assistant Chief of Police at the West Hartford Police Department.  Second Amended Complaint, ¶ 3.

**Admit.**

4.      At all times relevant, defendant Jeffrey Garewski was a Captain with the West Hartford Police Department.  Second Amended Complaint, ¶ 4.

**Admit.**

5.      At all relevant times, defendant Joseph Lasata was a Lieutenant with the West Hartford Police Department.  Second Amended Complaint, ¶ 3 (sic).

**Admit.**

6.      At all relevant times, defendant Stephen Estes was a Sergeant with the West Hartford Police Department.  Second Amended Complaint, ¶ 4 (sic).

**Admit.**

7.      At all times relevant Heather Bartram was the plaintiff's wife, and was employed as a Public Safety Dispatcher with the West Hartford Police Department.  Exhibit G, Deposition Transcript of Brian Bartram, pp. 8:18-19; 70:4-7.

**Admit.**

8.      At all relevant times, Sonja Vigue was employed as a Public Safety Dispatcher with the West Hartford Police Department.  Exhibit F, Affidavit of Sonja Vigue, ¶ 3.

**Admit.**

9.      During the fall of 1998, plaintiff Brian Bartram was diagnosed with Hepatitis C. On December 27, 2001, he began a forty-eight week course of Interferon treatment for the Hepatitis C.  Prior to beginning the treatment, his doctor warned him of a number of potential side effects from that course of medication, including sleep disturbances, anemia, and in rare cases, suicidal or homicidal tendencies.  His doctor further recommended that he take an antidepressant, Paxil, during the treatment.  Exhibit J, Brian Bartram Letter dated May 6, 2002; Exhibit G, Deposition Transcript of Brian Bartram, pp. 55-57; 184: 21-25; 185:1.

**Deny that the doctor warned him of side effects, the doctor told the plaintiff of the side effects. Deposition Transcript of Brian Bartram, at 55. Suicidal tendencies and homicidal tendencies are very rarely side effects of the Interferon. Deposition Transcript of Brian Bartram, at 55. Deny, that the plaintiff's doctor recommended that the plaintiff take Paxil, the doctor stated that he usually prescribes Paxil to his patients. Deposition Transcript of Brian Bartram, at 55.**

10.    Before even beginning the treatments, Bartram made an agreement with his wife Heather: that if any ill effects from the medication gave him or his wife any cause for concern about having seventeen firearms in their home, the firearms would be transferred to his brother-in-law for safe keeping. **Admit.**

Plaintiff Bartram did experience various side effects from the Hepatitis C treatments, including loss of sleep, loss of appetite, anemia, extreme shortness of breath, extreme fatigue and irritability. **Admit, that the plaintiff experienced loss of appetite, loss of energy, shortness of breath. Deny, that he was irritable; the plaintiff believes that he was a little more crabby. Deposition Transcript of Brian Bartram, at 57. He did not experience trouble concentrating or suicidal or homicidal tendencies. Deposition Transcript of Brian Bartram, at 57. The plaintiff did not have any concerns about his ability to perform his job. Deposition Transcript of Brian Bartram, at 74. Neither his co-workers or family members noticed a change in the plaintiff's behavior during his Interferon treatment; neither did anyone notice that the plaintiff was "crabbier" than usual. Deposition Transcript of Brian Bartram, at 59, 148 lines 1-9. The plaintiff did not act differently at work because of the medication. Deposition Transcript of Brian Bartram, at 148. The plaintiff did not miss any work after being diagnosed with Hepatitis C. Deposition Transcript of Brian Bartram, at 23-24.**

The plaintiff was concerned enough about the side effects to send his two children to live with their grandparents in Florida for the months of February, March and April, 2002. Exhibit G, Deposition Transcript of Brian Bartram, pp. 36: 18-25, 37: 1-18; 24: 7-25; 55-57; 58: 12-21. **Deny, that the reason the children were sent to Florida was because of the side effects, the children were sent to the grandparents' home so that the plaintiff would be able to have more undisturbed sleep. Deposition Transcript of Brian Bartram, at 24.**

11.    Plaintiff Bartram did not tell anyone in the West Hartford police administration, or any of his supervisors, about the fact that he was diagnosed with Hepatitis C or that he was undergoing a course of medication which caused numerous side effects. **Deny that the medication caused numerous side effects, the medication had possible side effects. Deposition Transcript of Brian Bartram, at 55-57. The plaintiff's treating physician, Dr. Versland, told the plaintiff that he did not have to tell his employer about the Hepatitis C because of the stigma surrounding the disease. Deposition Transcript of Brian Bartram, at 62.**

The only co-workers he informed about the Hepatitis C and his course of medication were Todd Hungerford and Sue MacDonald, his two closest friends at the police department. **Deny, that the only co-workers the plaintiff told were Hungerford and MacDonald, the plaintiff also told his wife, who was a co-worker and Susan Alverez who was a co-worker. Deposition Transcript of Brian Bartram, at 63-4.**

He informed them in late December, 2001, and asked them to keep the information confidential. **Admit.**

Bartram discussed his concerns about the side effects of the medication with Hungerford and MacDonald, so that they could notify him if they noticed any problems or decline in his work.

Exhibit G, Deposition Transcript of Brian Bartram, pp. 203: 6-13; 59: 12-14; 62: 23; 75: 11-15; 184: 25-185: 14; 60-62; 148: 2-7. **Deny, that the plaintiff told Todd and Sue MacDonald of his concerns about the side effects, the plaintiff told Todd and Sue MacDonald of the medication so that if he was "foggy headed or anything like that or if they were to notice a decline in my work, that they would be able to let me know that if I didn't notice it. Deposition Transcript of Brian Bartram, at 62.**

12.    Toward the end of March 2002, plaintiff Bartram learned that these two close friends, Todd Hungerford and Sue MacDonald, were having an affair. **Admit.**

Bartram felt wounded by the affair and reacted badly to it. **Deny, that the plaintiff reacted badly to the affair. Deposition Transcript of Brian Bartram, at 318.**

He stopped speaking to them and vice versa. **Deny, Susan stopped speaking to the plaintiff. Deposition Transcript of Brian Bartram, at 318.**

Despite his concerns, plaintiff Bartram never complained to any of his supervisors or to any of the defendants regarding the affair or its effect on communications in the workplace, before April 17, 2002. Exhibit G, Deposition Transcript of Brian Bartram, pp. 270-273:3; 318: 14-25; 319: 1-11. **Deny, a complaint had been made to Garewski prior to April 17, 2002 regarding a pair of G-String underwear that were found in the unisex bathroom and were later determined to be Sue MacDonald's underwear. MacDonald Deposition, at 129-30, 141. The West Hartford Police Department and the ERC had a history of conflicts where supervisors would turn their backs to the problem and ignore the conflict. Bartram Deposition, at 34-5.**

13.    In the early morning hours of April 17, 2002, the plaintiff's wife, Heather, who was also employed by the West Hartford Police Department as a Public Safety Dispatcher, went to

defendant Captain Garewski's office and asked to talk. She was very emotional. She told Captain
Garewski that plaintiff was upset about a personal relationship that had developed between two co-
workers, Sue MacDonald and Todd Hungerford, and the alleged affair's effect on relationships
within the ERC. She said that the plaintiff was not doing very well with the situation and in
addition had a personal health situation that he was dealing with. She also said that the plaintiff
was not eating and was having trouble sleeping. Captain Garewski told Heather that he would
speak with the involved parties and suggested that Brian seek some assistance from Pathways, a
counseling service available to employees, to deal with his personal issues. Heather said that she
would mention it to the plaintiff when she got home. Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 4,
5.

**Admit, that Heather Bartram met with Garewski. Deny, that Heather went to talk to
Garewski about the plaintiff, Heather went to Garewski to make him aware of the conflicts
in the ERC and Carol Thibideau's spreading of rumors about the plaintiff and Heather
requested that Garewski stop the conflicts in the ERC. Heather's Affidavit, ¶ 3. Deny, that
Heather told Garewski that the plaintiff was not doing well or that he was not eating or
sleeping, Heather told Garewski that the plaintiff had a medical situation. Heather's
Affidavit, ¶ 4. Deny, that Garewski told Heather that he would address the conflicts in the
ERC. Heather's Affidavit, ¶ 3. Deny that Garewski suggested that the plaintiff seek
counseling at Pathways, but did say that the plaintiff should talk to someone. Heather's
Affidavit, ¶ 3. Heather had not come to Garewski regarding problems with the plaintiff but
with problems in the ERC and Garewski turned the conversation toward the plaintiff.
Heather's Affidavit, ¶ 3. Admit, that Heather agreed to mention counseling to the plaintiff.**

14.    Later that morning, Captain Garewski went: to the ERC to talk to personnel there.
Dispatchers Iris Goldfarb and Sharon Williams were present. Iris immediately raised some

6

personal issues relating to a conflict with another dispatcher, Carol, and complained that Carol was spreading lies about what was going on in ERC. Iris also said that the Sue MacDonald/Todd Hungerford situation was making her uncomfortable. Iris then stated that she felt that Brian Bartram was becoming ill because of Carol's lies and the Sue and Todd relationship. Captain Garewski told Iris that the first he heard of this was earlier that morning when Heather referred to it, asked Iris why it took several months to report the situation to a supervisor, and told her that any concerns should have been reported as soon as they occurred so that: they could have been handled immediately. He also told her that he would address the issue with both Sue and Todd Hungerford. Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 6,7.

**Deny, Garewski's Notes.**

15.      Iris said that she needed a breath of fresh air and then she walked outside to the ERC courtyard. About an hour later, Captain Garewski heard a radio call that an ambulance was needed in the rear courtyard. He responded to where Iris was being treated by medical personnel and learned that she had apparently passed out. Exhibit A, Affidavit of Jeffrey Garewski, ¶ 8.

**Admit.**

16.      On that same afternoon at approximately 1:00 p.m. plaintiff Bartram called the ERC and was told by dispatcher Sonja Vigue that their co-worker, Iris Goldfarb, had evidently passed out and had been taken to the hospital. Exhibit F, Affidavit of Sonja Vigue, ¶ 5; Exhibit G, Deposition Transcript of Brian Bartram, p. 149: 22-25; p. 150: 1-9.

**Admit.**

17.      Thereafter, at approximately 2:30-2:45 p.m., plaintiff Bartram came into the ERC highly agitated, red-faced and yelling. He was sputtering things like, "They better talk to me.

They talked to everybody else.  Nobody's talked to me.  They didn't talk to Todd Smith and look

what happened."  Dispatcher Sonja Vigue, who was working in the ERG, heard the remarks and,

after thinking about it for a bit, felt that the statement about Todd Smith was a "red flag" and a

"cry for help", as Todd Smith was a West Hartford police officer who had shot and killed himself

in his police cruiser about a year before.  Exhibit F, Affidavit of Sonja Vigue,¶¶ 6-9.

**Deny.  The Plaintiff's mood and attitude were calm but concerned about Iris
Goldfarb's condition.  Bartram Deposition, at 153.  The plaintiff was not red faced,
agitated or yelling.  Bartram Affidavit ¶ 2.  When the plaintiff arrived at the ERC at
approximately 3:00 p.m., the plaintiff obtained directions to Iris Goldfarb's house and asked Sharon if
she would mind staying a few minutes later so that he could deliver flowers to Godlfarb's house.  Bartram
Deposition, at 151.  The plaintiff delivered flowers to Goldfarb's house and he returned to
the ERC at approximately 4:00.  Bartram Affidavit ¶ 2.  When the plaintiff returned he
was not red faced or agitated or yelling and was thankful to Sharon for staying past her
shift.  Bartram Affidavit ¶ 2.**

**Deny that  Vigue observed the plaintiff agitated as she did not react to a suicidal person as she had been
trained: Vigue did not tell anyone immediately  that he was a risk , she did not try keep him calm  and she did not
keep him with her to talk as she had been trained to do in situations where there was a person who was suicidal or
posed a risk to himself or others.  Vigue Deposition, at 54.  After the plaintiff made the alleged
suicidal statements to Vigue, the plaintiff delivered flowers to his co-worker Goldfarb and
Vigue did not attempt to stop him.  Vigue Deposition, at 54.**

18.    At approximately 3:30 p.m. dispatcher Sue MacDonald came to Captain

Garewski's office at his request.  Captain Garewski told her that he wanted to discuss some issues

that had been brought to his attention, and asked her about her current relationship with Brian

Bartram.  Sue MacDonald said that she and Brian used to be good friends, but that since he became aware of her relationship with Todd Hungerford, he had become increasingly difficult to work with and had refused to talk to her.  When she tried to reach out to him about this, his response was a profanity.

**Deny, that the plaintiff was difficult to work with, Deny that the plaintiff refused to talk to MacDonald, they did not speak to each other.  Bartram Affidavit ¶ 4.  Deny, MacDonald did not reach out to the plaintiff at any time after the plaintiff became aware of the affair.  Any interaction the plaintiff had with MacDonald was professional and the plaintiff never used profanity toward MacDonald.  Id.**

19.    While Captain Garewski was talking to Sue MacDonald, he received a telephone call from Dispatcher Sonja Vigue, who had just gotten off work.  Sonja expressed to Garewski her serious concerns about the plaintiff, whom she had interacted with a short while before, and asked if Captain Garewski was planning to talk with plaintiff.  Sonja told Captain Garewski that "He really wants to talk to you.  He is talking about Todd Smith and I don't know what he is going to do."  Captain Garewski told Sonja that plaintiff had made similar remarks in the presence of others that day, including himself, and he assured Sonja that he would talk to the plaintiff.  Exhibit A, Affidavit of Jeffrey Garewski, ¶ 11.

**Deny, Vigue got off work, went home and called Garewski at 4:00 p.m.  This was after the time that MacDonald had met with Garewski.  Sonia Vigue Deposition, at 28-29.  Deny, Vigue did not hear the plaintiff threaten harm to himself or others.  Vigue Deposition, at 52.  Deny, when Vigue allegedly spoke to Garewski on the phone, Garewski told Vigue that he had already spoken to the plaintiff, which Garewski had not done.  Vigue Deposition, at 28-29; Defendant 56(a) Statement ¶20.  Garewski also told Vigue during the alleged phone**

call that Garewski and Lasata had already spoken to the plaintiff, which they had not done yet.  Vigue Deposition, at 54-55.; Defendant 56(a) Statement ¶26. Deny, when the plaintiff arrived at the ERC at approximately 3:00 p.m., the plaintiff obtained directions to Iris Goldfarb's house and asked Sharon if she would mind staying a few minutes later so that he could deliver flowers to Godlfarb's house. Bartram Deposition, at  151.  The plaintiff then returned to the ERC at approximately 4:00 and was thankful to Sharon for staying later.  Vigue was not concerned about the plaintiff and whether he was a risk to himself or others because she did not tell anyone immediately  that he was a risk , she did not try keep him calm  and she did not keep him with her to talk as she had been trained to do in situations where there was a person who was suicidal or posed a risk to himself or others. Vigue Deposition, at 54.  After the plaintiff made the alleged suicidal statements to Vigue, the plaintiff delivered flowers to his co-worker Goldfarb and Vigue did not attempt to stop him. Vigue Deposition, at 54.

20.    Shortly thereafter, Captain Garewski asked the plaintiff to come to his office.  He did so at approximately 4:00 p.m. and he immediately asked Captain Garewski if he needed a "union rep".  Captain Garewski told plaintiff that he was merely aware that the plaintiff wanted to talk and that the meeting was in no way disciplinary.  Captain Garewski told plaintiff that he was looking into several alleged problems in the ERC and that he wanted to know how the plaintiff felt about it.  Plaintiff Bartram was immediately argumentative and seemed infuriated with the relationship between Sue MacDonald and Todd Hungerford.   The plaintiff said that something had better be done about that relationship right away or he was going to have an attorney file suit against the administration for allowing a "sexually charged workplace".  The plaintiff said that he could not work with Sue and Todd Hungerford and that he had been taking vacation and comp time so that he would not have to work with them, and that working with them was making him sick.  Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 12-13.

**Deny, in part, on April 17,2002, Garewski called the plaintiff to his office. The plaintiff told Garewski about the problems in the ERC including the lack of communication between the dispatchers. Bartram Deposition, at 157. Garewski told The plaintiff that it was not the department's concern. Bartram Deposition, at 157. Garewski told The plaintiff that he was the only dispatcher who was not cooperating with him and told The plaintiff that he could excuse himself from the meeting. Bartram Deposition, at 160. During The plaintiff's meeting with Garewski, The plaintiff did not yell or use profanity toward Garewski during the meeting. Bartram Deposition, at 160-61. The plaintiff was not enraged. Bartram Affidavit ¶ 5.**

21.    At this point the plaintiff was enraged. His hands were shaking. The plaintiff told Captain Garewski that he had some health issues, and that he had been losing weight and not sleeping since his co-workers' relationship started. As Captain Garewski tried to calm the plaintiff down, he became louder and kept cutting him off. The plaintiff acknowledged that he was aware of Captain Garewski's conversation with his wife earlier that morning, and of Captain Garewski's suggestion that the plaintiff speak with a counselor at Pathways. He then told Captain Garewski, his supervisor, "It's nobody's fucking business who I talk to." Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 15-16; Exhibit G, Deposition Transcript of Brian Bartram, pp. 185: 20-25; 186: 1-6.

**Admit, in part, that at the first meeting with Garewski the plaintiff's hands were shaking. Bartram Deposition, at 185. Deny the rest of facts. On April 17,2002, Garewski called the plaintiff to his office. The plaintiff told Garewski about the problems in the ERC including the lack of communication between the dispatchers. Bartram Deposition, at 157. The plaintiff explained to Garewski that the on going lack of communication within the ERC jeopardized public safety. Bartram Deposition, at 142. Garewski told the plaintiff that it was not the department's concern. Bartram Deposition, at 157. Garewski told the**

**plaintiff that he was the only dispatcher who was not cooperating with him and told the plaintiff that he could excuse himself from the meeting. Bartram Deposition, at 160. During the plaintiff's meeting with Garewski, the plaintiff did not yell or use profanity toward Garewski during the meeting. Bartram Deposition, at 160-61. The plaintiff was not enraged. Bartram Affidavit ¶ 5.**

22.     Plaintiff repeated  to Garewski at the first meeting that Sue and Todd Hungerford would not talk to him, and that they had created a hostile workplace that he could not work in.  He specifically told Captain Garewski, "I want them to talk to me.  It took everyone too long to talk to Todd Smith." The plaintiff continued to be very upset and to use profanity.  He repeated that he would not work with Sue MacDonald and Todd Hungerford and had arranged his work schedule so that he would never have to talk to them again. Plaintiff Bartram became even more upset than before and said that he was being "persecuted".  When Captain Garewski told him that the conversation was over and asked him to leave, Bartram slammed the crash bars on the door as he went down the stairs.

**Deny, These sentences come from "Garewski's notes". Deny, the plaintiff did not mention Todd Smith in the first meeting with Garewski. The plaintiff never said "I'm going to pull a Todd Smith" in front of Garewski. Garewski deposition, at 156, lines 20-25, 157, line 1.  Deny that the plaintiff was very upset, the plaintiff frustrated with the situation and the fact that Garewski would not do anything to resolve the conflict in the ERC.  The plaintiff did not use profanity toward Garewski. . Admit, that the plaintiff requested a shift change to avoid working with both Hungerford and MacDonald at the same time. Deny, the plaintiff did not say that he felt he was being persecuted.  Bartram Affidavit ¶ 5. Deny, the plaintiff did not use more force than normal to open the doors, when the plaintiff opened them.  Bartram Affidavit ¶ 6.  Admit that the plaintiff told Garewski that he was working in a**

**hostile workplace.  Bartram Deposition, at  130, 132.  Admit that the plaintiff told Garewski**

**that he was requesting a transfer to a different shift because of the work environment.  Admit**

**that Garewski told the plaintiff that he was the only dispatcher who was not cooperating and**

**had been unyielding. Deny, that the plaintiff told Garewski that he was being persecuted, the**

**plaintiff told the Dempsey Hospital, not Garewski, that he was feeling persecuted by Garewski.**

**Bartram Deposition, at 196.**

23.    The agitation and demeanor displayed by the plaintiff during the meeting were

especially disturbing to Captain Garewski because he felt that both were very out of character for

the plaintiff, whom he had previously always found to be courteous, cooperative and respectful.

Exhibit A, Affidavit of Jeffrey Garewski, ¶ 22.

**Admit, that the plaintiff was courteous, cooperative and respectful. Deny, that the**

**plaintiffs demeanor was disturbing to Garewski or anyone. Deny that the plaintiff was acting**

**out of character.**

24.    That same afternoon of April 17, 2002, defendant Sergeant Stephen Estes was on

duty when plaintiff Bartram came into the first floor hallway from upstairs.  Before Sergeant

Estes could greet him, plaintiff Bartram conspicuously glared at him and marched down the

hallway in a forceful manner, and appeared to Estes to be in an emotional and agitated state.

Exhibit C, Affidavit of Stephen Estes, ¶ 4.

**Deny, that the plaintiff glared at Estes. Bartram Affidavit ¶ 7.  Deny that the plaintiff**

**was in an emotional and agitated state.  Estes did not observe anything to suggest that the**

**plaintiff was in an emotional or agitated state.  Estes Deposition, at 59-60.  Estes did not have**

**any verbal communication with the plaintiff at that time. Estes Deposition, at 57.**

25.    Captain Garewski then called the plaintiffs immediate supervisor, Lt. Lasata, and told him about the meeting and of his concern about the plaintiffs physical and mental health. Defendant Captain Garewski also told Lt. Lasata that plaintiff had made some comments which Garewski believed to indicate that Bartram was possibly suicidal.  Captain Garewski asked defendant Lt. Lasata what other supervisor was working, and was informed that Sergeant Estes was.  Lt. Lasata told Captain Garewski that the plaintiff had gone out- to his car and agreed to let Captain Garewski know when the plaintiff returned.  Captain Garewski briefly filled Chief Strillacci in on what had happened.  Exhibit A, Affidavit of Jeffrey Garewski, ff 2 0-21; Exhibit B, Affidavit of Joseph Lasata, 4; Exhibit E, Affidavit of James Strillacci, ¶ 4.

26.    Shortly thereafter, plaintiff was requested to join Garewski, Lasata and Estes in the Lieutenants office.      During the meeting, plaintiff Bartrams voice was raised, he was agitated and emotional.  Plaintiff Bartram was asked if he felt alright and if he wanted to go home. Bartram said that he did not want to go home and that he felt fine, but mentioned again that he felt persecuted.  Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 23-24; Exhibit B, Affidavit of Joseph Lasata, ¶ 7; Exhibit C, Affidavit of Stephen Estes, ¶ 6.

**Deny, before meeting with Garewski, Lasata and Estes, but after meeting with Garewski the first time, the plaintiff logged on as a dispatcher, began working and took several calls. Bartram Deposition, at 164.  While the plaintiff worked with MacDonald after meeting with Garewski, MacDonald did not notice the plaintiff acting disruptive or agitated and as he worked next to MacDonald he did not yell, glare or use profanity. MacDonald Deposition, at 93, 102. Lt. Lasata then summoned the Plaintiff to his office and asked the Plaintiff if he was doing alright and the Plaintiff responded that he was fine. Bartram Deposition, at 166. The Plaintiff was then summoned to Lt. Lasata's office again where Lt. Lasata, Captain Garewski and Sergeant Estes were present.  Bartram**

**Deposition, at 169.   Deny.  Lt. Lasata asked The plaintiff if he was doing alright and the plaintiff responded that he was fine. Bartram Deposition, at 166. Admit that the plaintiff was responding to Garewski who told the plaintiff that the plaintiff was the only dispatcher who was not cooperating.  Estes Deposition, at 101.**

27.    Captain Garewski asked plaintiff Bartram if he had any firearms with him or in his car and he replied that he did not.  Captain Garewski asked him if he was thinking of hurting himself and he replied, "No, but it would be easy to do because I have firearms at home.  You remember what happened to Todd Smith."  **Deny. This sentence is directly from "Garewski's notes". Garewski did not take notes during this alleged exchange with the plaintiff. Garewski Deposition, at 162: 15-23.**  Exhibit A, Affidavit of Jeffrey Garewski, ¶ 25; Exhibit B, Affidavit of Joseph Lasata, ¶ 8; Exhibit C, Affidavit of Stephen Estes, ¶ 6; Exhibit M, Police Report, Emergency Committal, dated 4-17-02.

**Admit in part,  deny, in part.  Garewski began asking the plaintiff the following questions:**

**(a)  Are you going to hurt yourself? To which the Plaintiff said "No." Bartram Deposition, at 169.**

**(b)  Are you going to hurt any anybody else or want to hurt anybody else? To which the Plaintiff said "No." Bartram Deposition, at 169.**

**(c)  Do you have any firearms in the building? To which the Plaintiff said "No, that would be against orders. But that's a valid question, given the whole Todd Smith case." Bartram Deposition, at 171.**

**(d)  Are you going to be able to work tonight? To which the Plaintiff said "Yes. I have been working. I didn't think job performance had been an issue."  To which Garewski responded: "No, job performance has never been an issue." Bartram Deposition, at 172.**

**After the meeting with Garewski, Lasata and Estes, the plaintiff was allowed to return to work, which he did and took several calls. Bartram Deposition, at 173. MacDonald, who worked with the plaintiff immediately after his meeting with Lasata, Garewski and Estes, did not observe the plaintiff acting agitated,**

28.     Captain Garewski, Lt. Lasata and Sergeant Estes were each very concerned about plaintiff Bartram's reference to Todd Smith, and to having firearms at home.  All three were well aware that Todd Smith was a West Hartford police officer who had committed suicide with a firearm on duty approximately a year before.  Based on plaintiff Bartram's emotional state, his statement about Todd Smith, and his reference to having firearms at home, the three supervisors each believed he might be suicidal**.** Exhibit A, Affidavit of Jeffrey Garewski, ¶¶ 22-26; Exhibit B, Affidavit of Joseph Lasata, ¶ 7-9; Exhibit C, Affidavit of Stephen Estes, ¶ 7-9.

**Deny, that Garewski, Lasata and Estes were concerned about the plaintiff as none of them offered the plaintiff a referral to Pathways the Employee Assistance Program and mental health provider program during any of their interactions with him on April 17, 2002, Garewski Deposition, at  160: 18-23; 161: 13-19,  they did not ask the plaintiff if he was seeing a doctor, or how he was feeling or if there was something wrong. Garewski Deposition, at 161-162.  Admit, in part that Garewski, Lasata and Estes decided to make the plaintiff subject to an emergency committal.  Estes Deposition, at 72-73. The plaintiff never said that he was going to commit suicide and he never said that he had a plan to commit suicide and he never said he didn't want to live any more. Garewski Deposition, at 161-162. No one told Estes that the plaintiff was suicidal or dangerous. Estes Deposition, at 241.  The plaintiff discussed Todd Hungerford and Sue MacDonalds affair with Garewski in their meetings on April 17, 2002, the plaintiffs mention of Todd Smith was in the context of his concern for Todd Hungerford, because like Todd Hungerford, Todd Smith had an affair,**

and soon thereafter killed himself on duty.  Garewski Deposition, at 174-5.

29.    After conferring in private, the three determined that the safest thing they could do for plaintiff Bartram and everyone else was to send him to a hospital for an evaluation by a professional, as allowed under state law. **Deny, that state law allows for an emergency committal without probable cause. Deny, that the safest option was to commit the plaintiff to a psychiatric evaluation.  The procedure that is used when someone indicates a suicidal tendency or emotional distress, is to offer a referral to Pathways or another mental health provider and  none of the defendants offered the plaintiff a referral to Pathways, the Employee Assistance Program, or another mental health provider program during any of their interactions with him on April 17, 2002. Garewski Deposition, at  160: 18-23; 161: 13-19,  They did not ask the plaintiff if he was seeing a doctor, or how he was feeling or, if there was something wrong. Garewski Deposition, at 161-162.  During the conversation with the plaintiff neither Garewski, Lasata or Estes told the plaintiff to calm down or settle down  or try to reduce the plaintiffs alleged agitation. Estes Deposition, at 240-241.  Neither Estes Garewski nor Lasata asked the plaintiff if he was under psychiatric treatment during the conversation, which was another option to facilitate the plaintiffs safety if Garewski, Lasata or Estes were concerned about the plaintiffs safety.  Estes Deposition, at 250.  Estes made a determination that the plaintiff was suicidal and a harm to himself after a "quickie meeting" with Garewski, Lasata and the plaintiff. Estes Deposition, at  251.  Deny, that Garewski, Lasata and Estes were concerned for the plaintiffs safety and that they made the emergency committal to save the plaintiffs life because after meeting with the plaintiff, they let the plaintiff leave  Lasata's office and go back to work for 15-20 minutes.  Estes Deposition, at 85-87.** Lt. Lasata then went to the ERC and asked the only dispatcher working, Sue MacDonald, to call an ambulance, "code two", which means no lights or sirens, which she did by

telephone. **Deny that MacDonald was the only dispatcher working, MacDonald worked with the plaintiff between the plaintiffs meetings with his supervisors. MacDonald Deposition, at 93, 102.  Admit that Lasata ordered MacDonald to call for an ambulance and report that the call was for an emotionally disturbed person. MacDonald Deposition, at 96-98.**  As requested by Captain Garewski, the ambulance was instructed to meet them in the back of the police department to keep things as low key as possible.  **Admit.** Exhibit A, Affidavit of Jeffrey Garewski, ¶ 27-28; Exhibit B, Affidavit of Joseph Lasata, ¶ 10-13; Exhibit C, Affidavit of Stephen Estes, ¶ 9.

30.    Captain Garewski then briefed Chief Strillacci on the three defendant supervisors concerns about Bartram and on the actions they had decided to take, and the Chief supported their decision.  Exhibit A, Affidavit of Jeffrey Garewski, ¶ 29.

**Admit.**

31.    Sergeant Estes informed plaintiff Bartram that they were arranging for him to be transported to a hospital for an evaluation. **Deny, that Estes told the plaintiff that he was arranging for an ambulance. The plaintiff first found out about the ambulance that had been called to pick him up when the AMR dispatcher called to advise that the ambulance was on scene and was requesting a CAD time to log in that the ambulance had arrived at the West Hartford Police Department.**

After being told this, plaintiff became calm and cooperative. **Deny that the plaintiff was anything but cooperative from the time he came onto his shift at 3:00.  Admit, that the plaintiff was calm and cooperative, as he had been throughout his shift.**

Bartram asked if he could first change out of his uniform, so Sergeant Estes stood by while he did so. **Admit, that the Estes went into the bathroom with the plaintiff as the Lt. had ordered**

18

**Estes to stay with the plaintiff.  Estes Deposition, at 77.**

Plaintiff Bartram also asked Estes who would pay for the evaluation, and whether it would cause the

state police to take away his pistol permits.  **Admit.**

      At no time did he question the decision or resist the officers in implementing their

decision.  **Deny, that the plaintiff did not resist, the plaintiff asked if the evaluation was**

**voluntary or not and Estes stated that it would be in his best interest if he went on his own.**

**Once Estes told the plaintiff that he was going to be committed Estes did not allow the**

**plaintiff out of his sight and told the plaintiff that he was not allowed to leave his sight.**

**Estes Deposition, at 76.  The plaintiff was taken into custody by Estes and was not free to**

**leave and Estes made the plaintiff feel that he was not free to leave.  Estes Deposition, at**

**127-128.**

      32.     Bartram was not physically restrained in any way, and he walked cooperatively to

the ambulance. **Deny, Sergeant Estes, Sergeant Solono and Lt. Lasata physically assisted the**

**plaintiff to the ambulance, admit that the plaintiff was cooperative.**

      Plaintiff did refuse to answer the EMT's when they asked him for his pertinent medical

information. **Deny, the plaintiff did cooperate with providing his medical information.  In**

**the ambulance the plaintiff provided Estes with his home address, he also informed Estes**

**that Heather was asleep at home because she had worked  the midnight shift.**

      The ambulance then left for the John Dempsey Hospital at the University of Connecticut.

**Admit.**  Exhibit C, Affidavit of Stephen Estes, ¶ 12.

      33.     In view of Bartram's statement of having firearms at home, an application for a

search and seizure warrant was then prepared in order to secure all of Bartram's firearms for his

safety, and that of others.  **Admit, that the only basis for applying for the search warrant was**

**that the plaintiff had firearms at his home.**  Once the application was completed, Sergeant Estes

called Assistant State's Attorney John O'Reilly. Sergeant Estes read the body of the search and

seizure warrant to O'Reilly, explained what had taken place, and answered O'Reillys various

questions. O'Reilly verbally approved the warrant, and said that it was alright to present it to a

judge. Exhibit C, Affidavit of Stephen Estes, ¶ 13-14; Exhibit I, Search and Seizure Warrant;

Exhibit M, Police Report, Follow-up, dated 4-17-02. **Admit.**

34.     Sergeant Estes and Sergeant Tom Traskos then went to the home of Superior Court

Judge Rubinow, who signed the warrant: at approximately 9:15 p.m. The warrant authorized

them to search plaintiff Bartrams automobiles and his Suffield, Connecticut residence for

firearms. Suffield Police Department was then notified that they would be executing a search and

seizure warrant in Suffields jurisdiction. Exhibit C, Affidavit of Stephen Estes, ¶ 15-16; Exhibit

I, Search and Seizure Warrant; Exhibit M, Police Report, Follow-up dated 4-17-02.

**Deny. When the search and seizure warrant was presented to the Judge Rubinow,**

**Estes did not inform the judge that the plaintiff could have already been released from the**

**UConn Health Center after he had been examined because Estes did not check with the**

**UConn Health Center. Deposition of Estes, at 154-156. Deny, that Estes called Suffield**

**police to notify them of the warrant, Estes called the Suffield police to have them standing**

**by, but neither Estes or any of the other defendants called the Suffield police to secure the**

**Bartram home and make sure that the plaintiff did not gain access to the weapons while**

**Estes spent two hours typing up the search warrant. Deposition of Estes, at 147-148. None**

**of the defendants notified the Suffield Police Department that the plaintiff was a risk to**

**himself or others and none of the defendants checked with the UCONN Health Center to**

**see whether the plaintiff had been released. Deposition of Estes, at 149-150. Estes knew the**

**plaintiff could be immediately released after the hospital examined him. Deposition of Estes,**

**at 153.**

35.     At approximately 10:30 p.m., Sergeant Estes went to the Bartram residence in Suffield together with Sergeant Traskos, Detectives Semper and Nelson, and Sergeant Huntley of the Suffield Police Department.  **Admit.** Plaintiffs wife, Heather Bartram, answered the door and allowed the police officers to enter the premises. **Deny, Estes had a signed warrant, Heather did not voluntarily let the officers into the house.**  Heather told them that after a telephone conversation with plaintiff Bartram at the hospital, she had given the guns to a relative, Greg Gardner, approximately one half hour prior to their arrival. **Admit.**  (Although she did not tell the officers this, she had made this arrangement in accordance with the plan she and her husband had agreed to before he commenced the Hepatitis C medication regimen.)  The officers searched the residence and found ammunition and magazines, but no guns.  **Admit.** Exhibit C, Affidavit of Stephen Estes, ¶ 17-19; Exhibit G, Deposition of Brian Bartram, pp. 36: 18-25; 37: 1-18; Exhibit I, Search and Seizure Warrant; Exhibit M, Police Report, Follow-up dated 4-17-02.

36.     After they completed their search, Heather talked to them about plaintiff Bartram. She confirmed that Bartram was having both physical and mental health issues, and that she had had a long conversation with him regarding Todd Smith's suicide. **Deny, that Heather told them that the plaintiff was having both physical and mental health issues. Admit, that Heather confirmed that the plaintiff was taking several medications.  Heather's Affidavit, ¶ 7.** Heather also told them that Brian was on an anti-depressant medicine. **Deny, Heather told them that the plaintiff was several medications.  Heather's Affidavit, ¶ 7.**  As the police officers were leaving, Heather told them that plaintiff Bartram had called her from the hospital just as they were there and said that the hospital would be releasing him.  Exhibit C, Affidavit of Stephen Estes, ¶¶ 20-21; Exhibit I, Search and Seizure Warrant; Exhibit M, Police Report, Follow-up dated 4-17-02.

**Deny, the plaintiff was released from the UConn Medical Center at 10:15 p.m. (Exhibit 18).**

37.     Meanwhile, plaintiff Bartram had arrived at the John Dempsey Hospital at 6:22 p.m.  The hospital consultation report states that "pt is a 33 year old male presents to ED on police emergency certificate for evaluation for suicidality.  Patient has been having difficulties with his colleagues at work.  He recently found out his two good friends are having an affair and has stopped talking to them.  For the past three weeks he has been upset at the conflict at work for he continues to have to work with them in the same room.  Today the sergeant tried to talk with him and asked him if he could reconcile and he got upset and started to say obscenities.  He was questioned about suicidal ideation and patient stated that he was not, and he understood why they were asking, because of another cop that had committed suicide and when asked if he had guns stated 'at home'."  The notes further indicate that the plaintiff Bartram acknowledged having suicidal ideation in high school due to depression.  Exhibit H, John Dempsey Hospital Report.

**Admit that the Hospital Report states the above.**

38.     During his evaluation, Bartram admitted that when meeting with his supervisors he became upset and used obscenities, made reference to having firearms at home, and referred to the suicide of a West Hartford police officer.  Exhibit H, John Dempsey Hospital Report; Exhibit G, Deposition Transcript of Brian Bartram, pp. 190-193: 8.

**Deny, the exhibit and deposition transcripts do not support these facts. Deposition Transcript of the Plaintiff Bartram, at 190- 193.  Deny that the plaintiff admitted to referring the suicide of a WH officer during the meeting with his supervisors, the report states: "He was questioned about suicidal ideation and patient stated that he was not, and <u>he understood why they were asking, because of another cop that had committed suicide</u> and when asked if he had guns stated 'at home'." Deposition of Bartram, at 190-193.**

39.    Plaintiff Bartram was given a final diagnosis of "adjustment disorder" and was referred to Ten Talcott Notch for a follow-up evaluation. Plaintiff Bartram was discharged at approximately 10:15 p.m. that same night.  Exhibit H, John Dempsey Hospital Report; Exhibit G, Deposition Transcript of Brian Bartram, pp. 192: 23-25; 193: 1-8.

**Deny, the doctor who performed the evaluation stated that "patient does not meet criteria for a admission.  Patient should follow up with a Dr. at 679-6700." Medical Reports, Exhibit .**

40.    The next morning, plaintiff Bartram left a voicemail message for defendant Assistant Chief Carl Rosensweig, informing him that Bartram would not be coming into work that day or the next, and that he would be taking vacation days for April 18 and 19, 2002. **Deny, the plaintiff contacted Lt. St. Jacques, the shift commander, and did not know if he should work his scheduled shift on April 18th.   The plaintiff contacted Rosenswieg to find out if he should appear to work.  An hour before the plaintiff's shift was to start, Rosensweig contacted the plaintiff and told him that the plaintiff needed to provide a fitness for duty letter.  Bartram Affidavit ¶ 12.**    Defendant Assistant Chief Rosensweig had not been involved in the April 17, 2002 decision to transport plaintiff Bartram to the hospital for an evaluation, and was not aware of what had occurred until the next day, when he was briefed by Captain Garewski.  Assistant Chief Rosensweig met with Pat Morowsky of the West Hartford Employee Services Department regarding the issue of Brian Bartram's fitness to return to work. Their first concern was to see if he was emotionally stable, and that it was psychologically appropriate for him to return to work.  **Deny, none of the plaintiff's supervisors were concerned about his status as they did not check with him or the hospital after he was transferred to the hospital.**  Exhibit D, Affidavit of Carl Rosensweig, ¶¶ 5-7.

41.    On April 18, 2002, Assistant Chief Rosensweig called plaintiff Bartram at home

and informed him that he would need a note from a licensed psychiatrist or psychologist stating

that he was not a danger to himself or others before he could return to work. Rosenswieg made

the decision to require the plaintiff to submit to a fitness for duty examination.

Bartram told Rosensweig that he already had an appointment for the next day at Pathways,

a counseling service available to employees, and that he would update the Department on his

progress there. Exhibit D, Affidavit of Carl Rosensweig, ¶ 9.

**Admit.**

42.     On April 19, 2002, Public Safety Dispatcher Sharon Williams also called Captain

Garewski to express her concern about the plaintiff, Brian Bartram.  Sharon sounded upset.  She

said that when Bartram had left Captain Garewski's office on April 17, 2 002, he came into the ERC

and was very upset.  He made a brief reference to Todd Smith and said that he was going to his

car.  Bartram told Williams that if he was not back in ten minutes to look for him where Iris was

laying, a reference to where Iris Goldfarb had previously passed out.  Sharon told Garewski that at

first she thought Brian Bartram was upset and just letting off steam, but after thinking about it she

realized maybe he would try to hurt himself.  She said that Brian was a good co-worker and she

did not want to see him get hurt.  Exhibit A, Affidavit of Jeffrey Garewski, ¶ 30.

**Deny, that the plaintiff was upset, deny that the plaintiff mentioned Todd Smith to**

**Sharon Williams, deny that the plaintiff told Sharon Williams to look for him where Iris**

**Goldfarb had passed out.  Bartram Affidavit ¶ 2.**

43.     On April 23, 2002, Assistant Chief Rosensweig called plaintiff Bartram again.

Bartram told Rosensweig that he was working with a licensed psychotherapist, Philip Mays, and

expected to be cleared to return to work by the end of the week or the beginning of the next week.

Bartram asked Rosensweig to call Mays to let him know what was expected regarding the letter

authorizing Bartram's return to work, and he did so.  Exhibit D, Affidavit of Carl Rosensweig, ¶ 10.

**Admit.**

44.     On March 9, 2002, Rosensweig received a letter from Philip Mays stating that plaintiff Bartram was fit for duty, and Bartram returned to work that same day.  However, by correspondence dated May 6, 2002, Bartram had requested a medical leave of absence directly related to side effects from the medication he was taking for the treatment of Hepatitis C.  Therein, he requested the leave to begin in the middle of May and stated that he planned to return again to work on January 1, 2003.  Bartram's request for a medical leave of absence was approved and his leave began on May 25, 2002.  Exhibit D, Affidavit of Carl Rosensweig, ¶¶ 11-14.

**Admit.**

45.     On or about December 19, 2002, Assistant Chief Rosensweig received a letter from Dr. Mark Versland stating that plaintiff Bartram was able to return to work on January 1, 2003. Bartram returned to work on January 1, 2003, but by correspondence dated January 22, 2 003, voluntarily resigned his position effective February 5, 2 003. Exhibit D, Affidavit of Carl Rosensweig, ¶¶ 15-17.

**Admit.**

## PLAINTIFF'S MATERIAL FACTS IN DISPUTE

**TIMELINE OF EVENTS OF APRIL 17, 2002**

(1)      During First Shift, West Hartford Police Department Emergency Room Center (hereinafter "ERC") dispatcher, Iris Goldfarb, lost consciousness outside in the Police Department Courtyard for approximately 30 minutes and was taken by ambulance to John Dempsey Hospital at the UConn Medical Center. (hereinafter "Hospital").

(2)      Prior to arriving for his shift that starts at 3:30 p.m., the plaintiff, an ERC dispatcher, is notified of Goldfarb's illness and purchases flowers for her and fellow dispatcher Sharon Williams, who found Goldfarb unconscious, on his way into work.

(3)      At approximately 3:00 p.m., the plaintiff arrives to the ERC, he obtains directions to Goldfarb's house and gives Williams her flowers.  The plaintiff delivers the flowers to Goldfarb.

(4)      At approximately 3:34 p.m., Garewski meets with Susan MacDonald. Garewski's Notes, Exhibit 13.

(5)      At approximately 4:00 p.m., Garewski meets with the plaintiff.

(6)      At 5:46 p.m., Estes signs the Emergency Committal Form to force the plaintiff to an emergency evaluation. Emergency Committal Form , Exhibit 22.

(7)      At 6:22 p.m., the plaintiff arrives at the Hospital. Hospital Records, Exhibit 18, p. 2.

(8)      At 9:30 p.m., the psychiatric evaluation is complete and the doctor determines that the plaintiff should be released. Exhibit 18, p. 10.

(9)      At 10:15 p.m. the plaintiff is released from the Hospital. Exhibit 18, p. 3.

(10)      At 10:30 p.m., Sergeant Estes and other officers executed a Search Warrant at the plaintiff's home in Suffield after the warrant was signed by Judge Rubinow in West

Hartford.  Police Report, Exhibit  23.

**CREDIBILITY ISSUES WITH GAREWSKI'S NOTES**

(11)     Garewski's affidavit and testimony during his deposition rely heavily upon notes

that he prepared and were produced in this litigation. (See Garewski's Notes, Exhibit 13.)

In the case of his affidavit attached to the Defendants' Motion for Summary Judgment,

most of the paragraphs of the affidavit are taken directly from the document hereinafter

described as "Garewski's Notes". Defendants' Exhibit A; Plaintiff's Exhibit 13.

(12)     When Garewski prepares a report for work he puts the date that the report was

written on every report, Garewski Deposition, at 64-65, 70, but Garewski did not put the

date he prepared his notes on the notes and only has the date that the events occurred.

(See Garewski's Notes, Exhibit 13.)  The "Garewski notes" were not contemporaneously

made. Garewski Deposition, at 113.

(13)     Garewski took notes regarding the Bartram incident but has never kept any notes

for any other event that has taken place at the WHPD or on any other employee of the

WHPD. Garewski Deposition, at 86, lines 7-9; 100, lines 19-22.

(14)     Garewski modified the notes on April 29, 2002 on his computer and testified that

he printed the notes and kept them in a locked cabinet.  He then testified that he had not

seen a printed out version of the notes until he printed the notes out the morning of the

deposition. Garewski Deposition, at 89- 93.

(15)     Garewski testified that when he quoted someone in his notes it was a direct quote

from someone and he had taken notes on a note pad as he spoke with the person in order

to write down their quotes. Garewski Deposition, at 120.

(16)     Garewski testified that he took contemporaneous notes of the conversations he

had with the ERC staff but he typed the handwritten notes into the computer at a later

time and the computer notes were not done contemporaneously. Garewski Deposition, at 121-22. Garewski testified that he made mistakes when he typed his handwritten notes into the computer, specifically; he made errors as to times. Garewski Deposition, at 132.

(17)     Garewski used his notes in preparation for the deposition and relied on the notes to defend himself in the present lawsuit.  Garewski Deposition, at 123-4.

(18)     There was no purpose for Garewski to create and maintain his notes except for the purposes of litigation as the Emergency Committal Form and the police reports were used officially to record the incidents of April 17, 2002. Garewski Deposition, at 167-168.

(19)     Sonia Vigue does not recall speaking with Garewski on April 27, 2002 as indicated in his notes. Carol Thibideau does not recall speaking with Garewski after April 17, 2002, as indicated in Garewski's notes. Carol Thibideau Deposition, at 146-47.

**THE FIRST MEETING WITH GAREWSKI AT 4:00 P.M.**

(20)     On April 17,2002, Garewski called Brian to his office.  Brian told Garewski about the problems in the ERC including the lack of communication between the dispatchers and complained that the atmosphere jeopardized public safety. Bartram Deposition, at 157. Garewski told Brian that the conflicts in the ERC were not  the department's concern. Bartram Deposition, at 157.  Garewski told Brian that he was the only dispatcher who was not cooperating with him and told Brian that he could excuse himself from the meeting. Bartram Deposition, at 160.

(21)     During Brian's meeting with Garewski, Brian did not yell or use profanity toward Garewski during the meeting. Bartram Deposition, at160-61.

(22)     After meeting with Garewski, Brian logged on as a dispatcher, began working and took several calls. Bartram Deposition, at 164. While the plaintiff worked with MacDonald after meeting with Garewski, MacDonald did not notice the plaintiff acting

disruptive or agitated and as he worked next to MacDonald he did not yell, glare or use profanity. MacDonald Deposition, at 93, 102.

(23)     Garewski testified that his reason for calling Bartram to his office at 4:00 p.m. was because he was "concerned about Brian and I knew that I had to talk to Brian to see what was wrong down there . . . I didn't want to let Brian get started with work if he was all upset I wanted to get him as quickly as I could. . . ." Garewski Deposition, at 136, lines 13-22. The plaintiff started his shift with Susan MacDonald at 3:30 p.m. and Garewski spoke with Susan MacDonald at 3:34 p.m., before he spoke with the plaintiff despite Garewski's need to talk to the plaintiff first. Garewski Deposition, at 134-36.

## THE FIRST MEETING WITH LASATA

(24)     Lt. Lasata then summoned Brian to his office and asked Brian if he was doing alright and Brian responded that he was fine. Bartram Deposition, at 166.

(25)     After meeting with Lasata, Brian went back to work and took several more calls for approximately fifteen minutes. Bartram Deposition, at 167. While the plaintiff worked with MacDonald after meeting with Garewski, MacDonald did not notice the plaintiff acting disruptive or agitated and as he worked next to MacDonald he did not yell, glare or use profanity. MacDonald Deposition, at 93, 102.

## THE MEETING WITH LASATA, GAREWSKI AND ESTES

(26)     Brian was then summoned to Lt. Lasata's office again where Lt. Lasata, Captain Garewski and Sergeant Estes were present. Bartram Deposition, at 169. Garewski began asking the plaintiff the following questions:

(a)     Are you going to hurt yourself? To which Brian said "No." Bartram Deposition, at 169.

(b)     Are you going to hurt any anybody else or want to hurt anybody

else? To which Brian said "No." Bartram Deposition, at 169.

(c)     Do you have any firearms in the building? To which Brian said "No, that would be against orders. But that's a valid question, given the whole Todd Smith case." Bartram Deposition, at 171.

(d)     Are you going to be able to work tonight? To which Brian said "Yes. I have been working. I didn't think job performance had been an issue."  To which Garewski responded: "No, job performance has never been an issue." Bartram Deposition, at 172.

(27)     After the meeting with Garewski, Lasata and Estes, Brian was allowed to return to work, which he did and took several calls. Bartram Deposition, at  173.

(28)     Garewski, Lasata and Estes were not concerned about the plaintiff as none of them offered the plaintiff a referral to Pathways the Employee Assistance Program and mental health provider program during any of their interactions with him on April 17, 2002, Garewski Deposition, at  160: 18-23; 161: 13-19,  they did not ask the plaintiff if he was seeing a doctor, or how he was feeling or if there was something wrong. Garewski Deposition, at 161-162.

(29)     Garewski, Lasata and Estes decided to make the plaintiff subject to an emergency committal.  Estes Deposition, at 72-73.

(30)     The plaintiff never said that he was going to commit suicide and he never said that he had a plan to commit suicide and he never said he didn't want to live any more. Garewski Deposition, at 161-162.

(31)     No one told Estes that the plaintiff was suicidal or dangerous. Estes Deposition, at 241.

(32)     During the conversation with the plaintiff neither Garewski, Lasata or Estes told the plaintiff to calm down or settle down  or try to reduce the plaintiff's alleged agitation.

Estes Deposition, at 240-241.

(33)      Neither Estes Garewski nor Lasata asked the plaintiff if he was under psychiatric

treatment during the conversation, which was another option to facilitate the plaintiff's

safety if Garewski, Lasata or Estes were concerned about the plaintiff's safety.  Estes

Deposition, at 250.

(34)      Estes made a determination that the plaintiff was suicidal and a harm to himself

after a "quickie meeting" with Garewski, Lasata and the plaintiff. Estes Deposition, at  251.

(35)       Garewski, Lasata and Estes were not concerned for the plaintiff's safety or the

safety of others because after meeting with the plaintiff, they let the plaintiff leave

Lasata's office and go back to work for 15-20 minutes.  Estes Deposition, at 85-87.

(36)      The plaintiff had concern for Todd Hungerford, because like Todd Hungerford,

Todd Smith had an affair, and soon thereafter killed himself on duty.  Garewski

Deposition, at 174-5.

## COMMUNICATION PROBLEMS IN THE ERC

(37)      The West Hartford Police Department and the ERC had a history of conflicts

where supervisors would turn their backs to the problem and ignore the conflict. Bartram

Deposition, at 34-5.

(38)      An affair between two dispatchers Todd Hungerford and Susan MacDonald,

created a hostile work environment which caused the plaintiff to request a transfer to a

different shift. Bartram Deposition, at 159.

(39)      Garewski, as the patrol Captain, was the responsible for the ERC. Garewski

Deposition, at 53-54.

(40)      All of the ERC dispatchers have used profanity while working. Garewski

Deposition, at 58.

(41)     It is a high pressure environment in the ERC and communication and cooperation is very important between the police department and the ERC and if people are not communicating with one another it could be a danger to the public or to officers. Estes Deposition, at 116.

(42)     Sue MacDonald and Todd Hungerford flirted with each other in the ERC and in front of ERC staff. Sue MacDonald Deposition, at 81-84.

(43)     A complaint had been made to Garewski prior to April 17, 2002 regarding a pair of G-String underwear that were found in the unisex bathroom and were later determined to be Sue MacDonald's underwear. MacDonald Deposition, at 129-30, 141. Plaintiff's affidavit.

(44)     Prior the April 17, 2002, on March 18, 2002, MacDonald sent an e-mail to the plaintiff, in response to the plaintiff's e-mail regarding the 911 transfer system, that stated: "freak-do what you want-stop bothering me!!!!!!!!!!!!" Exhibit 16.  To the plaintiff, who has an obvious facial malformation, the term "freak" is very derogatory.

**THE DECISION TO MAKE THE EMERGENCY COMMITTAL**

(45)     Garewski testified that he never offered to provide a referral to Pathways the Employee Assistance Program and mental health provider program during any of his interaction with the plaintiff on April 17, 2002, Garewski Deposition, at 160: 18-23; 161: 13-19, although if he knew that an employee was suicidal the: "first avenue is to offer assistance through our mental health provider . . . ." Garewski Deposition, at 155.

(46)     During all of the interactions Garewski had on April 17, 2002 with the plaintiff, Garewski never asked the plaintiff if he was seeing a doctor, or how he was feeling or asked if there was something wrong. Garewski Deposition, at 161-162.

(47)     During the conversation between Estes, Garewski and Lasata, where they decided

to commit the plaintiff, Garewski explained that the plaintiff had complained about the work environment in the ERC earlier that day. Estes Deposition, at 118.

(48)     Garewski, Lasata and Estes falsely "diagnosed" the plaintiff as "paranoid". Garewski has no training, experience or education in psychology or as a therapist. Garewski Deposition, at 39-40.

(49)     The plaintiff first found out about that an ambulance had been called for him when the AMR dispatcher called to advise that the ambulance was on scene and was requesting a CAD time to log in that the ambulance had arrived at the West Hartford Police Department.

(50)     Estes went into the bathroom with the plaintiff as the Lt. had ordered Estes to stay with the plaintiff.  Estes Deposition, at 77.

(51)     The plaintiff asked Estes if the evaluation was voluntary or not and Estes stated that it would be in his best interest if he went on his own. Once Estes told the plaintiff that he was going to be committed Estes did not allow the plaintiff out of his sight and told the plaintiff that he was not allowed to leave his sight.  Estes Deposition, at 76.

(52)     The plaintiff was taken into custody by Estes and was not free to leave and Estes made the plaintiff feel that he was not free to leave.  Estes Deposition, at 127-128.

(53)     The plaintiff cooperated with the EMTs and provided his medical information.  In the ambulance the plaintiff provided Estes with his home address, he also informed Estes that Heather was asleep at home because she had worked  the midnight shift.

**OTHERS NOT SUBJECTED TO EMERGENCY COMMITTAL**

(54)     Garewski spoke with Todd Hungerford on April 18, 2002, and although Todd used profanity in front of Garewski and Garewski was aware of the affair that Hungerford was having with MacDonald,  Garewski did not ask other employees about Hungerford's

mental state or refer him to Pathways, Garewski Deposition, at 176, although the plaintiff

had mentioned Hungerford's affair and his concern for Hungerford and the Hungerford

was depressed and guilty about his affair. Garewski Deposition, at 177.

### THE PLAINTIFF PLACED IN CUSTODY AND SUBJECTED TO AN EMERGENCY EVALUATION.

(55)     None of the defendants checked on the plaintiff's status at the UConn Health

center after the plaintiff was placed in the ambulance, Estes Deposition, at 136, although

two officers traveled with Iris Goldfarb to the hospital and drove her to her home after she

was released.

(56)     Lasata, Estes and Garewski took the plaintiff into custody and forced plaintiff into

an ambulance to be taken to the University of Connecticut Health Center Emergency

Room ("UCONN Health Center") for a Police Emergency psychiatric examination;

unsuccessfully attempted to commit the plaintiff, pursuant to Connecticut General

Statutes Section 17a-503;  Defendants slandered and defamed plaintiff by publishing the

false and defamatory statements that plaintiff was a "mental case" and that he was a

danger to himself  or others.

(57)     Plaintiff was examined by medical doctors and psychiatrist at UCONN Health

Center and thereafter immediately released.  Exhibit 18.

(58)     No officers were ordered to accompany the plaintiff to the hospital as they had

done with Iris Goldfarb when she was also taken to the hospital that morning.  When

Goldfarb returned to the WHPD from the hospital two officers escorted her home, no one

from the WHPD escorted the plaintiff home after he was released from the hospital.

Garewski's Notes; Bartram Affidavit ¶ 13.

(59)     Defendants made no effort to determine the result of the above referenced

psychiatric examination.

**SEARCH AND SEIZURE WARRANT OF PLAINTIFF'S HOME**

(60)     On April 17, 2002, the Estes caused to be drafted a search and seizure warrant application to search for weapons at plaintiff's home and his automobiles.  Search and Seizure Warrant, Exhibit 21.

(61)     The search warrant application contained the false fabricated information described above and failed to disclose that plaintiff had been examined pursuant to Connecticut General Statutes Section 17a-503, and had been released immediately following the examination. Id.

(62)     When the search and seizure warrant was presented to the Judge Rubinow, Estes did not inform the judge that the plaintiff had been released from the UConn Health Center after he had been examined and that the plaintiff did not pose any threat to himself or others. Deposition of Estes, at 154-156.

(63)     Estes did not call Suffield police to notify them of the warrant, Estes called the Suffield police to have them standing by, but neither Estes or any of the other defendants called the Suffield police to secure the Bartram home and make sure that the plaintiff did not gain access to the weapons while Estes spent two hours typing up the search warrant. Deposition of Estes, at 147-148.

(64)      None of the defendants notified the Suffield Police Department that the plaintiff was a risk to himself or others and none of the defendants checked whether with the UCONN Health Center whether the plaintiff had been released. Deposition of Estes, at 149-150.  Estes knew that the plaintiff could be immediately released after the hospital examined him but did not check whether the plaintiff had been released prior to presenting the search and seizure warrant to the Judge. Deposition of Estes, at 153.

(65)     Estes's conduct during the execution of the search warrant was "questionable" as

he was adversarial and told Heather about "Brian blowing his brains out." E-mail to

Assistant Chief Rosensweig, Exhibit 19.

## THE PLAINTIFF'S RETURN TO WORK

(66)     The plaintiff had been cleared by the psychiatrist at the Hospital at 9:30 p.m., prior

to the signing of the warrant by the Judge and prior to the execution of the Search Warrant.

Exhibit 18.

(67)     The plaintiff was cleared to return to work by Dr. Phillip Mays on May 7, 2002,

and returned to work as a dispatcher on May 9, 2002. Exhibits 11, 14, 15.

(68)     Rosensweig indicates in his own notes, that his concern when the plaintiff

returned to work was whether the plaintiff  "can get along with other employees."

Rosensweig Notes, Exhibit 12.

## EMERGENCY COMMITTAL PROCEDURES

(69)     The West Hartford Police Department has specific procedures when dealing with

an emotionally disturbed person, which has an effective date of March 13, 2000. PRD

Section 10.33, Exhibit 9.

(70)     When the ambulance was called for the plaintiff, at the direction of Lasata, the

call was for an emotionally disturbed person, pursuant to Section 10.33, a "mental case"

call. MacDonald Deposition, at 96; Vigue Deposition, at 52.

(71)     The PRD Section 10.33 provide the following directives: "When contact is made

with a person who is suicidal or apparently mentally ill who appears to be a danger to

himself/herself or others they will immediately be sent by ambulance to a local hospital

under an emergency committal.  The only exception to this is if an attending physician

wishes the patient to be sent to a specific facility."  PRD Section 10.33, Exhibit 9.

Neither Estes, Lasata or Garewski asked the plaintiff if he was treating with a physician and they did not consult with any attending physician prior to forcing the plaintiff into an emergency committal, in violation of PRD Section 10.33. Garewski Deposition, at 160-162.

(72)    The PRD Section 10.33 provide the following directives: "When contact is made with a person who is suicidal or apparently mentally ill who appears to need immediate help, but does not appear to be a clear danger to himself or others and is receiving treatment, every effort must be made to reach the counselor/doctor.  IF the person is not under treatment, or you are unable to reach the counselor/doctor the Mobile Crisis Team (MCT) will be called."  PRD Section 10.33, Exhibit 9.  Neither Estes, Lasata or Garewski asked the plaintiff if he was treating with a physician and they did not consult with any attending physician prior to forcing the plaintiff into an emergency committal, in violation of PRD Section 10.33. Garewski Deposition, at 160-162.  Further, the MCT was not called, an ambulance was called and the plaintiff was forced into the ambulance by Estes at Garewski and Lasata's direction and with Chief Strillacci's knowledge. Defendant 56(a) Statement ¶¶ 25, 29, 30.

(73)    The PRD Section 10.33 provide the following directives: "Under no circumstances shall a mentally disturbed person be left alone or allowed to operate a motor vehicle, if the person is a danger to himself or others." PRD Section 10.33, Exhibit 9. After meeting with Garewski, Lasata and Estes, the plaintiff was allowed to work as a dispatcher between each meeting, Bartram Deposition, at 164,  and was allowed to his vehicle: "Lt. Lasata told Captain Garewski that the plaintiff had gone out-to his car and agreed to let Captain Garewski know when the plaintiff returned."  Defendant 56(a) Statement ¶ 25. Garewski, Lasata and Estes also let the plaintiff leave and go back to work

37

for 15-20 minutes alone.  Estes Deposition, at 85-87.


THE PLAINTIFF,
BRIAN BARTRAM


BY: _____
James S. Brewer
Brewer & O'Neil, LLC
818 Farmington Avenue
West Hartford, CT  06119
Phone: (860) 523-4055
Fax: (860) 233-4215
jimsbrewer@comcast.net
Federal Bar No. ct07019

## CERTIFICATION

  This is to certify that a copy of the foregoing was mailed via U.S. Mail, postage pre-paid on August 6, 2004, to the following:


Scott M. Karsten, Esq.
Sack Spector & Karsten
836 Farmington Avenue
West Hartford, CT 06119

Marcia J. Gleeson
Sack, Spector, & Karsten
836 Farmington Avenue
West Hartford, CT 06119


            _____
             James S. Brewer