UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRIAN BARTRAM,<br>    Plaintiff, | :   NO.: 3:02CV2148(SRU) |
| vs. | |
| TOWN OF WEST HARTFORD, CARL ROSENSWEIG, J.A. GAREWSKI, JOSEPH LASATA and STEPHEN B. ESTES,<br>    Defendants. | :   SEPTEMBER 20, 2004 |

## DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF SUMMARY JUDGMENT

**PRELIMINARY STATEMENT**

The plaintiff's claims in this case against the Town and the defendant police officials in their official capacities have previously been dismissed. What remains are claims for damages against the individual defendants in their individual capacities, as to which defendants now seek summary judgment in their favor. In light of plaintiff's submissions in opposition to defendants' motion, however, the real issue now is whether plaintiff's reversals of his previous sworn testimony, his current denials of matters of record, his semantic fencing, and his unrelenting focus on wholly immaterial points of dispute are sufficient to cloud the single real question on this motion: Did the defendants who referred plaintiff for an emergency psychiatric evaluation have at least an arguable, objective basis for doing so, based upon all the information they had at the time.

**ARGUMENT**

> **PLAINTIFF'S OBFUSCATION OF THE RECORD SHOULD NOT BE ALLOWED TO CLOUD THE EXISTENCE OF REASONABLE CAUSE FOR HIS REFERRAL.**

The plaintiff's efforts to recast the record in this case are nothing short of remarkable. Perhaps the most astonishing overall example of this is found in his assertion that, at the time of his meetings with the defendant supervisors on April 17, 2002, he was "courteous, cooperative and respectful." Plaintiff's Local Rule 56(a)(2) Statement, ¶ 23.[1] This description of his demeanor is consistent with his current denial that he yelled or used profanity in his meeting with defendant Garewski on that date. Id., ¶¶ 20, 21. However, it is certainly, and entirely, inconsistent with extensive portions of his sworn deposition testimony and the hospital record, not to mention the accounts of the defendants.

In his deposition on May 1, 2003 – as reflected in plaintiff's own Exhibit 4 – plaintiff Bartram expressly acknowledged that, during his initial meeting with Captain Garewski, he was upset and he used profanity. In fact, plaintiff was so upset following this meeting he asked another dispatcher to stay a few extra minutes "while I calmed down". Id., at 162. He then went out to his car because he was going to "hop inside and scream – literally scream." Id. Soon thereafter, he was asked by Lt. LaSata if he was all right. Plaintiff stated that he was, because "I was calmed down by then." Id., p. 166. As he was leaving the lieutenant's office, however, he started to say something, then stopped. The lieutenant said to plaintiff, "you can tell me"; Bartram's only reply was, "No, no, no, forget it." Id.

---

[1] Notably, there is absolutely no citation to any evidence in the record supporting this assertion, in plain violation of Local Rule 56(a)3. This is also true of numerous other assertions and denials in Plaintiff's Statement. Where unsupported assertions and denials are material to issues raised by defendants' motion, as discussed herein, this Court may and should deem the defendants' positions uncontested.

After a brief interval plaintiff was called into another meeting, this time with defendants Garewski, LaSata and Estes all present. At this point, plaintiff testified, he was "getting annoyed at being singled out." Id., p. 168. As plaintiff specifically acknowledged to these three defendants, at his initial meeting with Garewski "I was upset; my hands were shaking and all that." Id., pp. 185-86. During this meeting, as he admitted in his deposition testimony, plaintiff also told the defendants he felt "persecuted". Id., p. 196. And, as he acknowledged to hospital personnel later, he "got upset and started to say obscenities" in the presence of his Captain. Id., p. 197; Plaintiff's Exhibit 18, p. 9. So much for plaintiff's current account, that he was at all times "courteous, cooperative and respectful" toward his supervisors.

It may perhaps be argued by plaintiff, that the exact language of plaintiff's Rule 56(a)2 denials regarding profanity during these meetings is not actually inconsistent with his sworn deposition testimony, in that the former carefully relate to profanity "directed toward" Captain Garewski. This distinction, indeed, was preserved by and apparently significant to plaintiff even at his deposition. E.g., p. 197, L-20. (This is not the only such miniscule semantic distinction maintained by plaintiff. See, e.g., Plaintiff's Rule 56(a)2 Statement, ¶ 9: plaintiff denies that he was "warned" of side effects from his medication regimen, but admits he was "told" of the side effects by the doctor.)

However, what was significant to plaintiff's supervisors at the time was not whether the profanity was directed at them; it was that plaintiff was using profanity in their presence at all. It was defendants' perception that this behavior was out of character for plaintiff, as their affidavits assert. Defendants' Rule 56(a)1 Statement, ¶ 23. Notably, plaintiff's denial of this Rule 56(a)1

assertion is one of those unsupported by any reference to the record. It therefore stands unrefuted, in accordance with the Rule.

Similarly, plaintiff acknowledged in his deposition testimony that, when he encountered defendant Estes in the hallway following his meeting with Captain Garewski, his expression was not one of greeting and friendship. Plaintiff's Exhibit 4, p. 163. In fact, when asked if he had "glared at" the sergeant, as Estes testified, plaintiff's only response was "[h]e startled me"; plaintiff acknowledged saying nothing to his supervisor. Id., p. 162.

Perhaps most significantly, notwithstanding plaintiff's current version, it was not only the defendant supervisors who were perceiving that plaintiff was unusually upset on this occasion – and in his deposition, plaintiff acknowledged as much. He admitted then that he told Sharon Williams he needed to calm down after his first meeting with Garewski. Id., p. 163. Fellow dispatcher Sonja Vigue reported to defendant Garewski her significant concerns, making specific mention of plaintiff's references to Todd Smith, the officer who had committed suicide not long before. Defendants' 56(a) 1 Statement, ¶ 19. Even plaintiff's wife, Heather, another dispatcher, had expressed concern to Captain Garewski regarding plaintiff's health and stress level earlier that day, as plaintiff knew. Id., p. 184.

In his opposition to summary judgment, however, plaintiff attempts to evade and obscure the significance of his prior testimony and others' accounts. As a prime example, the report of Sonja Vigue to Captain Garewski is disputed by the assertion that he was merely "calm but concerned". Plaintiff's Rule 56(a)2 Statement, ¶ 17. Plaintiff contends that Ms. Vigue must not have observed him in an agitated state, despite her sworn testimony that she did, because plaintiff contends that she did not respond as she had been trained to react "to a suicidal person". Id.; c.f., ¶

19. Nowhere in his response to defendants' assertions, however, does plaintiff actually deny having made the references to Todd Smith that Ms. Vigue found so troubling – and that she reported as such to Captain Garewski.  Most importantly, plaintiff cannot and does not deny that Vigue told Garewski exactly what she says and he confirms she did say.

Plaintiff attempts to deflect the significance of this encounter with his co-worker, Vigue, by asserting that Garewski could not really have been so concerned about her report and plaintiff's condition because he didn't meet with plaintiff until 4:00, after he met with dispatcher MacDonald, when plaintiff's shift started at 3:30 p.m.  Plaintiff's "Material Facts in Dispute", ¶ 23.  This contention is simply and typically contrary to the record, including plaintiff's sworn testimony at deposition.  There, he acknowledged that he had requested coverage from dispatcher Williams for the beginning portion of his shift, and had not arrived back at the police station until about 4:00 p.m., mere minutes before Garewski requested the meeting.  Plaintiff's Exhibit 4, pp. 151-52.

The account of that meeting presented now by plaintiff is likewise a model of evasive denial and dissemblance.  Plaintiff now asserts that he was calm, courteous and respectful at the time.  The plaintiff's deposition testimony was that he "became crabby", was upset, his hands were shaking, and he used profanity.  Plaintiff's Exhibit 4, pp. 153, 160, 185.  Plaintiff contends now that he complained to Garewski that the atmosphere in the ERC jeopardized public safety, and that Garewski dismissed plaintiff's report as "not the Department's concern".  Plaintiff's Statement of Material Facts in Dispute, ¶ 20; Plaintiff's Rule 56(a)2 Statement, ¶ 21.  In fact, Bartram testified that Garewski's statement was "[t]heir affair is not the Department's concern", with which plaintiff agreed.  Plaintiff's Exhibit 4, p. 157.

Plaintiff now contends that his supervisors could not have been genuinely concerned about him because they did not refer him to Pathways, the employee assistance program.  Plaintiff's Rule 56(a)2 Statement, ¶ 28.  Yet plaintiff admitted in his deposition that he was aware of Heather meeting with Captain Garewski earlier that same day, that in that meeting the Captain had specifically suggested that plaintiff "seek counseling", and that Heather had agreed to – and did in fact – relate to plaintiff Garewski's recommendation of counseling.  Plaintiff's Exhibit 4, pp. 183-84; Plaintiff's Rule 56(a)2 Statement, ¶ 13.

In similar evasive fashion, plaintiff now disputes that Heather told Captain Garewski about plaintiff having a "personal health situation he was dealing with", as Garewski attests; instead, Heather Bartram now argues that she told Garewski that plaintiff "had a medical situation."  Id., ¶ 13.  In his deposition, plaintiff phrased it that Heather had told Garewski plaintiff had "other health concerns".  Plaintiff's Exhibit 4, p. 183.  Now, supporting her husband's opposition to summary judgment, Heather Bartram denies telling Garewski that plaintiff was having both physical and mental health issues, but does admit that she told him plaintiff was taking "several medications."  Plaintiff's Exhibit 8, ¶ 5.

This and other examples of plaintiff's semantic wrangling serve primarily to illustrate the paucity of factual disputes over issues which are actually material to defendants' motion.  The exact language in which plaintiff's medical situation was discussed is simply not material; no more so than whether plaintiff was made "irritable" by the medication regimen he was taking, or whether he was more properly considered "a little more crabby", as he prefers to put it.  Plaintiffs' Rule 56(a) 2 Statement, ¶ 10.

What is uncontroverted is that none of the defendants was aware on the date of this incident that plaintiff was undergoing this prescription regimen, with its host of potential side effects. Plaintiff's Rule 56(a)2 Statement, ¶ 11. The only people at work plaintiff had told at the time were three ERC co-workers, one of whom was his wife. Id. The fourth person was a former co-worker, contrary to plaintiff's 56(a)2 Statement. Plaintiff's Exhibit 4, p. 63. Also undisputed is that plaintiff's current account of his reason for not telling the police administration - that his doctor told him "he did not have to" – is contrary to his sworn deposition testimony, in which he stated he could not recall, was not sure, did not know that the doctor had ever actually told him that. Id.

Plaintiff also seeks to avoid perhaps the most telling reality of this incident, that he actually was diagnosed with a recognized psychological condition, "Adjustment Disorder", a few hours following the evaluation for which defendants referred him. Defendants' Exhibit H. Plaintiff now apparently denies that this occurred, asserting that he did not meet the criteria for admission. Plaintiff's Rule 56(a)2 Statement, ¶ 39. Of course, the question of hospital admission is entirely distinct from that of the proper diagnosis, and plaintiff's denial is therefore simply unresponsive. Indeed, in his deposition plaintiff acknowledged what the hospital record showed to be the final diagnosis by the trained professional to whom defendants had referred him. Plaintiff's Exhibit 4, pp. 192-93. Similarly, plaintiff fails to acknowledge now that he himself made arrangements for follow up care, even before the Department required it. Plaintiff's Rule 56(a)2 Statement, ¶ 41.

Plaintiff points in his opposition to a claimed violation by defendants of a departmental regulation, P.R.D. ¶ 10.33, relating to emotionally disturbed persons. Plaintiff's Exhibit 9; Plaintiff's Statement of Material Facts in Dispute, ¶¶ 69-73. In ¶ 71, plaintiff claims defendants

violated this rule because they did not ask plaintiff if he was treating with a physician and did not consult with a physician before sending plaintiff for evaluation.  Id., ¶ 71.  This is at best a plain misreading of the directive, which simply provides for an attending physician's input as to the choice of a specific facility.  In fact, once defendants Garewski, Lasata and Estes had made the collective judgment that plaintiff might be a danger to himself, he was "immediately sent by ambulance to a local hospital", just as the regulation requires.  Id.  Indeed, plaintiff was given his choice of facilities, and chose UCONN.  Plaintiff's Exhibit 4, p. 186.

      Finally, plaintiff's argument regarding the search warrant executed at plaintiff's home for the seventeen (17) firearms he had kept there is nothing short of puzzling.  Plaintiff contends that the warrant application was defective because, in addition to Sergeant Estes allegedly mischaracterizing this statement, it "failed to disclose that plaintiff had been examined...and had been released immediately following the examination."  Plaintiff's Statement of Material Facts In Dispute, ¶¶ 61-62.  This contention is truly remarkable because, as plaintiff actually admits elsewhere, he in fact had not been discharged from the hospital by the time the warrant was signed, at approximately 9:15 p.m.  See, Plaintiff's Rule 56(a)2 Statement, ¶ 34 (no denial of time warrant signed); Estes Affidavit, ¶¶ 15, 16; Plaintiff's Exhibit 18, Emerg. Dep't Record; Plaintiff's Exhibit 4, pp. 191-92.

      In the end, plaintiff's argument comes down to this: that he actually "never said that he was going to commit suicide and he never said that he had a plan to commit suicide and he never said he didn't want to live anymore".  Plaintiff's Rule 56(a)2 Statement, ¶ 28.  Therefore, plaintiff contends, there could have been no reasonable basis for defendants to have concerns about plaintiff's mental state.  Plaintiff's Mem., p. 4.

To the contrary, had plaintiff said any of those things in the presence of an independent witness, such as Sonja Vigue or Sharon Williams, this case would have been stillborn. It is because there were questions, and concerns, and "red flags" without the overt threat, that Sonja Vigue and the defendants did not immediately treat plaintiff as suicidal, but did report and discuss his comments and behavior within minutes after observing them. It is precisely because the three "active" defendants, Garewski, Lasata and Estes, needed to confirm their perceptions of plaintiff's emotional state with each other that he was not immediately seized and transported to the hospital, until the last meeting did result in the consensus that this was required.

It is also noteworthy that Chief Strillacci entirely, and defendants Lasata and Estes to a somewhat lesser extent, relied upon Captain Garewski's report to them regarding his observations and perceptions of plaintiff's behavior and demeanor. Of course, police officers are entitled to rely on information from other police officers – and more independent sources such as Sonja Vigue – in evaluating the totality of the circumstances. And, to an extent, this case may be more about perception than reality: just how plaintiff's behavior was perceived by him, both then and in retrospect, and by the witnesses on April 17, 2002.

Indeed, plaintiff Bartram candidly admitted as much during his deposition. After reviewing the emergency committal form completed by Sergeant Estes, in which Estes reported a remark (also heard by other defendants) about Todd Smith, firearms at home and it being easy to hurt himself if he chose to; Plaintiff's Exhibit 4, p. 193; plaintiff acknowledged that Estes "may have heard it that way." Id., p. 195. He further agreed that it is "possible" Estes might have simply perceived what plaintiff said differently than did plaintiff, and further opined that "what was said and what is written are not necessarily all that far off." Id., pp. 195-96. In fact, plaintiff

agreed also with the confirmation of his having made this statement reflected in the hospital record. Id., p. 197. He even told the hospital doctor – the mental health professional he was referred to by the defendants – that he "understood" why they were asking the questions the defendants had asked him – because of the Smith suicide, still so fresh on the defendants' minds. Id., p. 197.

Despite plaintiff's efforts in opposing summary judgment to cloud the record of evidence in this case, defendants respectfully submit that the "totality of circumstances", at the time a prompt decision was required of them, established at a minimum an arguably reasonable basis for the action they took. Defendants therefore reiterate their motion for judgment in their favor: none of plaintiff's asserted causes of action is sufficiently supported in the evidence to be sustained. At the least, these defendants are entitled to qualified immunity against individual liability in damages, for making what must only and truly be considered a "dammed if you do, dammed if you don't" decision.

**CONCLUSION**

WHEREFORE, and for the reasons set forth in their initial submissions, defendants request their motion be granted.

        DEFENDANTS, CARL ROSENSWEIG,
        J.A. GAREWSKI, JOSEPH LASATA,
        STEPHEN B. ESTES and JAMES
        STRILLACCI

BY_____
        Scott M. Karsten
        Federal Bar No.: ct05277
        Sack Spector and Karsten
        836 Farmington Avenue
        West Hartford, CT 06119
        Their Attorney

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been mailed, postage prepaid, this 20th day of September, 2004, to the following counsel of record:

James S. Brewer, Esquire
818 Farmington Avenue
West Hartford, CT 06119

Carl Ficks, Esquire
Halloran & Sage
225 Asylum Street
Hartford, CT 06103-4303

$\underline{\hspace{3in}}$
Scott M. Karsten

Chief Clerk
United States District Court
915 Lafayette Boulevard
Bridgeport, CT 06604

- 11 -